COMMONWEALTH of Pennsylvania,
Appellee,

v.

Eric MOULTRIE, Appellant.

Superior Court of Pennsylvania.

Submitted Aug. 2, 2004.

Filed March 3, 2005.

Joseph F. Sklarosky, Sr., Forty Fort, for appellant.

Frank P. Barletta, Asst. Dist. Atty., Wilkes–Barre, for Com., appellee.

BEFORE: ORIE MELVIN, McCAFFERY, and TAMILIA, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 After a conversation with a police officer in which he was told he was free to leave, Appellant, Eric Moultrie, consented to a search of his person. The search revealed that he was carrying packets of what was later determined to be cocaine and heroin. On appeal, we are asked to decide whether the fruits of that search should have been suppressed. We conclude that the encounters between the police and Appellant were proper investigative detentions, and that Appellant's consent to the subsequent search was voluntary. Accordingly, the suppression court properly denied Appellant's motion to suppress, and we affirm Appellant's judgment of sentence.

¶ 2 The facts as found by the Honorable Peter Paul Olszewski, Jr. at the suppression hearing are as follows:

On June 9, 2003[,] at approximately 5:30 p.m., Kingston Borough Police Officers Sam Blaski and Edward Palka, who were both in full uniform and driving separate marked patrol vehicles, initiated a traffic stop on the Market Street Bridge. Because of the obvious safety concerns, Officer Blaski directed the driver to proceed over the bridge and to stop on North River Street in the City of Wilkes–Barre. The driver of the vehicle was identified as Kenneth Dunbar. The front seat passenger was identified as Eric Moultrie, [Appellant] in the instant matter. The traffic stop was conducted as a result of Officer Blaski's observations of the vehicle operating in an erratic manner, i.e., very fast and switching lanes without signaling. Additionally, the officer also observed the vehicle did not have an expiration sticker on the plate.

When Officer Palka arrived behind the

stopped vehicle,[1] he saw the passenger [Appellant] turn around and observe the officers and make a movement like he was putting something underneath the seat; a gesture the officer described as a furtive movement. Officer Blaski also observed [Appellant] rising up in the seat as if he was placing something somewhere. As Officer Blaski approached the driver's side, Officer Palka covered the passenger side and stood to the right rear of the passenger's door. When Officer Blaski engaged the driver, he discovered the driver was a wanted person and did not possess a valid driver's license. The driver was removed from the vehicle and placed into custody. Officer Palka asked [Appellant] if he had a valid driver's license. [Appellant] replied that he did not. Since the operator had been placed under arrest and [Appellant] had no license, he was asked to exit the vehicle. The vehicle would be towed from the scene. [Appellant] exited the vehicle as a result of Officer Palka's request. Neither Mr. Dunbar nor [Appellant] owned the vehicle.

Officer Palka asked [Appellant] if he had any weapons and [Appellant] replied he did not. Office Palka next asked [Appellant] if he would consent to a pat-down search. [Appellant] agreed. During the pat-down search no weapons were found. As Officer Palka conducted the pat-down search, [Appellant] put his hands down from the roof of the vehicle towards his crotch area and brushed against [Officer] Palka's hands. [Officer] Palka asked [Appellant] to replace his hands on the vehicle so that he could conclude the pat-down search. [Appellant] complied with this instruction for a couple of seconds before he again put his

hands back down. [Appellant] said nothing when he put his hands towards his midsection. Officer Palka found nothing during the search.

Officer Palka then advised [Appellant] to "have a seat" on the street curb. [Appellant] was neither placed under arrest nor handcuffed. Neither officer drew his weapon during the entire incident. [Appellant] wished to sit and wait for Mr. Dunbar in order to find out the amount of bail that might be needed. Officer Palka subsequently advised Officer Blaski that during the pat-down of [Appellant], [Appellant] got fidgety when Palka's hands approached [Appellant's] midsection. Officer Blaski, who received consent to search the vehicle from the driver, approached the vehicle to begin his search. As Officer Blaski did so, [Appellant] approached Officer Blaski and engaged him in small talk. [Appellant] was conversing about the driver who was now in the back of the police cruiser and about obtaining bail money for him. [Appellant] was also on his cell phone making phone calls in an attempt to arrange bail. Officer Blaski then advised [Appellant] that he was going to begin searching the vehicle and that [Appellant] was free to leave. [Appellant] advised Officer Blaski that he wanted to stay around and attempt to secure bail money for his friend. Officer Blaski did not instruct [Appellant] to leave the area.

[Appellant] chose to remain in the immediate vicinity of the police cruiser. Officer Blaski advised [Appellant] that should he wish to remain, [Officer Blaski] would request consent to conduct a search. [Appellant] agreed to the search and indicated that Officer Palka

---

1. Officer Palka recognized the car as one that had been used in an armed robbery a few days prior that had resulted in a police stand-

off and the recovery of guns and narcotics. (N.T. Suppression Hearing, 12/3/03, at 13–14).

had already performed a similar search. Officer Blaksi requested this search due to a concern about turning his back to [Appellant] while performing a search of the vehicle. [Appellant] raised his hands and Officer Blaski began patting his pockets; when ... the officer reached [Appellant's] groin section, [Appellant] grabbed Officer Blaski's hand. At the time, Officer Blaski felt plastic baggies which he suspected were drugs. The officer felt rubber bands and a couple of bundles. Officer Blaski immediately took [Appellant's] hand off his hand and advised [Appellant] he was under arrest. Officer Blaski described his tactile impression as bundles and a clear plastic baggie over the top. Officer Blaski is a trained and experienced police officer with regard to narcotics investigations. Officer Blaski's tactile impression and [Appellant's] conduct in grabbing the officer's hand occurred simultaneously. Blaski advised [Appellant] to stop grabbing his hand; [Appellant] smiled, raised his hands up and placed them on the vehicle.

(Findings of Fact and Conclusions of Law, dated December 9, 2003, at 1–5) (numerical references omitted). To this rendition we add that Officer Blaski finished the pat down of Appellant and recovered a bag of suspected narcotics,[2] a total of $370 in cash and a cell phone. (Notes of Testimony ("N.T.") Suppression Hearing, 12/3/03, at 44–45, 57–58). On December 3, 2003, Judge Olszewski held a hearing on Appellant's motion to suppress the evidence seized from the search. After listening to the testimony and observing the witnesses, Judge Olszewski resolved the issue of credibility in favor of the Commonwealth (Findings of Fact and Conclusions of Law at 5), and denied Appellant's motion to suppress the contraband. At the conclusion of the bench trial on December 8, 2003, Judge Olszewski convicted Appellant of two (2) counts of possession with intent to deliver[3] and related crimes,[4] and later sentenced him to a total of six and one-half (61/2) to thirteen (13) years' incarceration. Appellant then filed this timely appeal, presenting the following issues for our review:

I. WAS NOT THE CONSENT GIVEN BY [APPELLANT] FOR A SECOND PAT–DOWN "FRISK" INVALID IN THAT HE WAS THE SUBJECT OF AN UNLAWFUL DETENTION[?]

II. WAS NOT THE EVENTUAL SEIZURE—OR ARREST—OF [APPELLANT] INVALID IN THAT IT WAS NOT BASED ON PROBABLE CAUSE THAT HE HAD COMMITTED A CRIME[?]

(Appellant's Brief at 3).

▮ ¶ 3 As a prefatory matter, we are mindful of the following:

Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Since the prosecution

---

2. Inside of the plastic bag, police recovered 23 blue packets stamped "NYQUIL", 14 blue packets stamped "XXX" and 16 orange colored plastic heat sealed bags. The lab report confirmed that the contents of the plastic bag were illegal narcotics, and listed the weight of the cocaine seized at 6.1 grams and two separate weights of heroin at .28 grams and .89 grams. (N.T. Trial, 12/8/03, at 10–11).

3. 35 Pa.C.S.A. § 780.113(a)(30).

4. The related crimes were two counts of Possession of a Controlled Substance (35 Pa. C.S.A. § 780.113(a)(16)) and one count of Possession of Drug Paraphernalia (35 Pa C.S.A. § 780.113(a)(33)).

prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Blair,* 860 A.2d 567, 571 (Pa.Super.2004) (quoting *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 842 (2003), *cert. denied,* 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004)).

¶ 4 We have carefully reviewed the record and conclude that it fully supports the suppression court's factual findings. (*See* N.T. Suppression Hearing at 7–68). Thus, our focus now shifts to the propriety of the legal conclusions drawn from those facts by the suppression court. *See Blair, supra.*

¶ 5 Appellant first contends that he was subjected to an illegal investigative detention by Officer Blaski and, therefore, his consent to the pat down was not voluntary. As a consequence, Appellant maintains that the fruits of the pat-down should have been suppressed because the search was tainted by the illegal detention. (Appellant's Brief at 12–13). We reject Appellant's argument.

¶ 6 At the outset, we recognize that while the law regarding search and seizure is continually evolving, "its focus remains on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime." *Blair, supra* (citations omitted). Mindful of this balance, we recently ad-

dressed the elements of a voluntary consensual search in *Commonwealth v. LaMonte,* 859 A.2d 495 (Pa.Super.2004). There, we reiterated the applicable analysis in these cases:

> Where, as in the case *sub judice,* there is a factual finding of a consensual search,[5] our analysis of the legal propriety of this decision is two-pronged. *Commonwealth v. Strickler,* 563 Pa. 47, 56–57, 757 A.2d 884, 888–889 (2000).
>
> > The central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of the citizen/police encounter giving rise to the consent; and, ultimately, the voluntariness of consent. Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus. Where, however, a consensual search has been preceded by an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained absent a demonstration by the government both of a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of the prior illegality, and of voluntariness.

*LaMonte, supra* at 499 (quoting *Strickler, supra* ):

¶ 7 Instantly, as in *LaMonte,* "[t]he threshold inquiry in determining the lawfulness of encounters between citizens and the police is whether or not the subject has been seized." *Id.* (citation omitted).

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was

---

**5.** *See* Findings of Fact and Conclusions of Law at 6–7.

free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Id.* at 500 (quoting *Strickler, supra* at 57–59, 757 A.2d at 889–890). Our analysis of "whether there has been a seizure during an encounter between police and a citizen is necessarily fact-specific. Because the level of intrusion into a person's liberty may change during the course of the encounter, we must carefully scrutinize the record for any evidence of such changes." *Blair, supra* at 572 (citation omitted).

█ ¶ 8 In this case, we must scrutinize the entire incident leading up to the search which revealed that Appellant was carrying cocaine and heroin. There are four police encounters to examine for purposes of determining whether Appellant was legally "seized" at the time he gave his consent to the second search: (1) the initial encounter where the police stopped the car; (2) Officer Palka's request to do a pat-down search of Appellant; (3) Officer Palka's request that Appellant sit down on the curb; and (4) Officer Blaski's request to do a pat-down search of Appellant. Appellant argues that the encounter between himself and the police which preceded the second search of Appellant's person was an illegal investigative detention. While we agree that the encounters between Appellant and the officers were investigative detentions under the Fourth Amendment, we conclude that each encounter was lawful.

¶ 9 The initial encounter which brought Appellant into contact with the police was a valid investigative detention of Kenneth Dunbar, the driver of the car in which Appellant was a passenger. Dunbar was driving erratically and the car did not have an expiration sticker on the license plate. (N.T. Suppression Hearing at 35). Thus, the officers were justified in stopping and detaining the car in which Appellant was a passenger. Indeed, Appellant concedes that the initial stop was lawful. (Appellant's Brief at 10). As a result of this legal stop, the officers determined that Dunbar was wanted on an outstanding warrant and placed him under arrest. (*Id.* at 13, 38).

¶ 10 Following the arrest of Dunbar, the police officers had to determine what to do with the car, which was stopped in traffic in an illegal parking area, and with Appellant, the passenger therein. (*Id.* at 13). Reasonably, they asked Appellant if he had a valid driver's license so that he could drive the car. (*Id.*). Because Appellant did not have a license, the officers asked Appellant to get out of the car so that it could be towed away. (*Id.*) Officer Palka had recognized the car as one that had been used in a recent armed robbery which had resulted in a stand-off with police and the recovery of guns and narcotics. (*Id.*). As a result of this knowledge, and because he had seen Appellant make a furtive move when Appellant turned around inside the car and realized that the police were stopping the car, and because there had been a wanted person riding up front with Appellant, Officer Palka was legitimately concerned for his safety. (*Id.* at 10–11, 23–24). He asked Appellant for his consent to a pat-down search, which Appellant gave. (*Id.*). Officer Palka did not find any weapons during this *Terry* [6] frisk, but did note that Appellant appeared

6. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

to be trying to hide something in his groin area during the pat down. Officer Palka shared this impression with Officer Blaski. (*Id.* at 14–16, 25–27, 39–40).

¶ 11 We conclude that Officer Palka's pat-down search of Appellant for weapons was based on reasonable articulable suspicion that Appellant may have been carrying a weapon. This search was a reasonable, minimal intrusion, founded on justified concern for the officer's safety, as Appellant was not being taken into custody and clearly was not immediately leaving the area. Based on the factual findings of the trial court cited above, we conclude that this search was a valid investigative detention, designed specifically to insure the safety of the police officers. *See Blair, supra* at 575 (concluding that the investigative detention of the appellant was justified by the police officer's valid safety concerns after the appellant moved furtively in a car and where the officer had to turn his back on the appellant to continue his investigation).

¶ 12 The next encounter between Appellant and the police occurred when Officer Palka asked Appellant to have a seat on the curb. (*Id.* at 15, 28). The police officers were still trying to decide what to do with Appellant, as he could not drive the car away. The request that Appellant sit on the curb was not accompanied by any physical or other "show of authority" or any other type of restrictive measure. (*Id.*) In fact, it was the most minimal type of "intrusion" and, under other circumstances would have been regarded as a polite gesture. We characterize it as an investigative detention only because it followed directly on the heels of the *Terry* frisk. This action was reasonable and lawful. Accordingly, we conclude that the facts as found by the trial court support the conclusion that this encounter was also a valid investigative detention.

¶ 13 The final encounter between the police and Appellant began when Appellant approached Officer Blaski, who was about to search the car, and started asking him about how to secure bail for the driver, Mr. Dunbar. (*Id.* at 40–41). After speaking briefly with Appellant, Officer Blaski told Appellant that he was going to start searching the car and that Appellant was "free to leave; he had to leave." (*Id.*) Any reasonable person in Appellant's position would have had no doubt that he or she was free to go. Rather than leaving, however, Appellant chose to remain at the scene. The record clearly reflects that Appellant had every intention of staying at the scene until he had determined how to bail out Mr. Dunbar and that he had conveyed that specific intention to stay to the officers. (*Id.* at 40–42). Accordingly, we conclude that the investigative detention ended at this point.

¶ 14 Faced with the prospect of turning his back on Appellant in order to search the car after having witnessed Appellant make furtive movements in the car prior to the stop, and in light of Officer Palka's description that Appellant became "fidgety" every time Palka got near Appellant's mid-section, Officer Blaski had ongoing concerns for his own safety. (*Id.* at 39–40). As a result of this concern and because it was "his" traffic stop, Officer Blaski asked Appellant if he could pat him down again in light of Appellant's decision "to stick around." (*Id.* at 42–43). Appellant consented once again. (*Id.*). It was as a result of this second pat-down search that Officer Blaski felt what he believed to be illegal contraband, an impression based on his experience. (*Id.*). We conclude that at the time of this second request for consent to a pat-down, Appellant was no longer "seized" for Fourth Amendment

purposes, as a reasonable person in his position would have believed that he or she was free to leave.[7] Indeed, Appellant appeared to understand this at the time in question, because he specifically expressed *his intention to stay* to Officer Blaski.

¶ 15 Because we have concluded that the initial encounters between Appellant and the police were constitutionally valid, the voluntariness of the subsequent search which yielded illegal narcotics becomes our exclusive focus. *See LaMonte*, 859 A.2d at 500. *See also Strickler*, 563 Pa. at 56–57, 757 A.2d at 888–889; *Commonwealth v. Acosta*, 815 A.2d 1078, 1083 (Pa.Super.2003), *appeal denied*, 576 Pa. 710, 839 A.2d 350 (2003).

> Our Supreme Court has adopted a "totality of circumstances" test by which to assess the validity of consensual searches following valid stops, and has specifically stated that such searches are not *ipso facto* coercive. *Strickler, supra.* "To establish a voluntary consensual search, the Commonwealth must prove that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will over-

borne—under the totality of the circumstances." *Acosta, supra.*[8]

*LaMonte, supra.*

¶ 16 In this particular case, the facts as found by the suppression court reflect no police excesses. The officers did not display their weapons at any time nor did they physically direct any of Appellant's movements. Other than their requests to be permitted to frisk Appellant, their only verbal communications to Appellant were actually requests that he get out of the car and sit on the curb so that the car could be towed. These requests, considered in context, constituted polite requests designed to accommodate Appellant while the police made arrangements for the car, rather than verbal directions intended to confine Appellant. The entire encounter occurred in June in the light of the late afternoon, on a public road in the city of Wilkes–Barre. The demeanor of the officers was polite and respectful at all times. Prior to Officer Blaski's search, Appellant was specifically told he could leave, but nevertheless chose to stay and expressed his intent to do so to the officers. Appellant's determination to remain on the scene to help bail out his friend demonstrates his maturity, sophistication, and his relative lack of fear of these offi-

---

**7.** Even if we had concluded that any one of the preceding investigative detentions was illegal, Officer Blaski's clear communication to Appellant that he was free to leave and Appellant's clear expression of his determination to stay constitute "a sufficient break in the causal chain between the illegality and the seizure of evidence, thus assuring that the search is not an exploitation of [any] prior illegality, and of voluntariness." *See LaMonte*, 859 A.2d at 499 (quoting *Strickler*, 563 Pa. at 56–57, 757 A.2d at 888–889).

**8.** A non-exclusive list of factors the courts may consider in assessing the legality of a consensual search includes:

    (1) the presence or absence of police excesses;

    (2) physical contact or police direction of the subject's movements;

    (3) the demeanor of the police officer;

    (4) the location of the encounter;

    (5) the manner of expression used by the officer in addressing the subject;

    (6) the content of the interrogatories or statements;

    (7) whether the subject was told that he or she was free to leave; and

    (8) the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will).

*LaMonte, supra* at 500 (quoting *Strickler*, 563 Pa. at 72–73, 79, 757 A.2d at 897–898, 901).

cers as well as his capacity to exercise his free will.

¶ 17 Finally, citing *Commonwealth v. Freeman*,[9] Appellant urges us to conclude that his consent was not freely given because Officer Blaski did not specifically advise Appellant that he could refuse the officer's request to frisk him. We decline Appellant's invitation.

¶ 18 Contrary to Appellant's position, there is no requirement that a police officer advise a person that he or she may refuse consent to be searched. *Commonwealth v. Key*, 789 A.2d 282, 291 (Pa.Super.2001). Unless the totality of factors indicate that the consent was the product of express or implied duress or coercion, *see Acosta, supra*, the mere fact that a police officer did not *specifically* inform an appellant that he or she could refuse the request will not in and of itself result in a determination that the subsequent search was involuntary.

¶ 19 Based upon the foregoing, we have determined that Appellant's consent to the search of his person was the product of an essentially free and unconstrained choice. *See Acosta, supra*. We base our decision on the trial court's factual findings, supported by the record, as well as on the reasoning set forth above. Accordingly, under the totality of the circumstances, we conclude that the suppression court was correct in determining that Appellant voluntarily consented to the search of his person. Thus, Appellant's first challenge is unavailing.

¶ 20 Alternatively, Appellant posits in his second question presented that Officer Blaski lacked probable cause to arrest him because the requirements of the "plain feel" doctrine were not satisfied. Relying upon *Commonwealth v. Guillespie*,[10] Ap-

pellant asserts that the evidence subsequently seized should have been suppressed. (Appellant's Brief at 14–15). We disagree.

¶ 21 In *Guillespie*, we revisited the interplay between the "plain feel" doctrine and a *Terry* frisk, stating:

This [C]ourt now recognizes the seizure of non-threatening contraband detected by an officer's "plain feel" during a patdown for weapons if the officer is lawfully in a position to detect the presence of contraband, the incriminating nature of the contraband is immediately apparent and the officer has a lawful right of access to the object. *Interest of B.C.*, 453 Pa.Super. 294, 305, 683 A.2d 919, 925 (1996) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 2136–37, 124 L.Ed.2d 334 (1993)).

[*Commonwealth v. Fink*], 700 A.2d [447,] 450 [Pa.Super.1997] (citation omitted).... [F]or purposes of a plain feel search, the term " 'immediately apparent' means that the officer conducting the *Terry* frisk readily perceives, without further search, that what he is feeling is contraband." *Id.* Thus, the "plain feel" doctrine only applies under the limited circumstances where the facts meet the plain view doctrine requirements that the criminal nature of the contraband is immediately apparent, and the officer has a lawful right of access to the object.

*Guillespie, supra* at 657. The application of *Guillespie* to the case *sub judice* ends here, as the facts therein differ in several crucial respects. In *Guillespie*, a police officer on patrol spotted two men fitting the general description of alleged robbers in the vicinity of a reported robbery. Other officers moved in to effectuate an inves-

---

9. 563 Pa. 82, 757 A.2d 903 (2000).

10. 745 A.2d 654 (Pa.Super.2000).

tigatory stop and observed the appellant's co-defendant discard something. An officer by the name of Rodriguez frisked the appellant and "felt from the outside of his pockets what appeared to be two pill bottles." *Id.* at 656. When asked what was in his pockets, the appellant replied that it was candy. Either before or after this initial pat-down, Officer Rodriguez handcuffed the appellant. Subsequently, the robbery victim arrived at the scene and indicated that neither of the men was a perpetrator of the robbery. *Id.* Thereafter, the police discovered that the items discarded by the co-defendant were drugs. Officer Rodriguez then conducted a second pat-down search of the appellant and removed the items from the appellant's pockets. *Id.* Although the trial court denied his motion to suppress the evidence and ultimately convicted the appellant of possession with intent to deliver and related crimes, this Court reversed and remanded for a new trial. Our Court first decided that the record did not support the factual conclusion that the pill bottles were "immediately apparent" contraband [11] justifying a further warrantless search of the appellant's pockets, and, second, that the officer no longer had a lawful right of access to the objects at the time of his intrusive search.[12] *Id.* at 659.

¶ 22 The more analogous case to the facts before us is *Commonwealth v. Johnson*,[13] wherein this Court upheld the search and seizure of contraband under the "plain feel" exception to the warrant requirement. There, the officer conducting a lawful pat-down felt what he perceived to be illegal narcotics, which he described as "a crunchy, granular substance" in the appellee's crotch. *Id.* at 1337. We held that the record was "sufficient to establish that the officer's tactile impression combined with his years of experience, led him to reasonably conclude that what he felt was a controlled substance." *Id.* at 1340. Additionally, the officer's perception and the location of the package together with the surrounding circumstances "combined sufficiently to betray the illegal nature of the object on [the] appellee's person." *Id.* at 1340–41

¶ 23 Instantly, Officer Blaski explained:

Q. Why did you want to pat him down?

A. I was turning my back to him. He was sitting on the curb behind me and I was going to search the car.

* * * *

Q. How did that occur?

A. He raised his hands up and I began patting his pockets, and when I got in the area of his groin section he grabbed my hand. At that time I felt like plastic baggies that appeared to be a bundle of what I suspected to be a drug. I felt rubber bands; a couple of bundles there. At that time I took his hand off mine and told him he was under arrest.

*Id.* at 659.

---

11. The *Guillespie* Court reasoned:
    [A]ny innocuous small object(s) could have been contained within the pill bottles. Second, if the officer had thought that the objects in the pockets were 'immediately apparent' as contraband, he should not have stopped his search and later decided to resume a more detailed search of Guillespie's pockets once he received evidence of drugs having been discarded by his co-defendant.

12. This Court determined that at the point when the robbery victim arrived at the scene and eliminated Guillespie as a robbery suspect, Officer Rodriguez no longer had reasonable suspicion and any further detention was improper. *Id.*

13. 429 Pa.Super. 158, 631 A.2d 1335 (1993).

Q. And when you felt those items, what made you believe that they would be some type of a controlled substance?

A. I could feel what seemed to be like small bundles. Like the clear plastic baggie, you could feel that over on top; plus the area it was located.

(N.T. Suppression Hearing at 43–44). Based upon Officer Blaski's tactile impressions and the location of the items, we agree with the suppression court's finding of probable cause to arrest Appellant and seize the contraband. Appellant's reliance on *Guillespie, supra* is misplaced and his alternative contention is devoid of merit.

¶ 24 Because we agree that Appellant's consent to the second pat-down search was voluntary and that Officer Blaski had probable cause to arrest Appellant and seize the contraband, we conclude that the trial court properly denied Appellant's motion to suppress. Accordingly, we affirm Appellant's judgment of sentence.

¶ 25 Judgment of sentence affirmed.