**Commonwealth v. Creazzo**

416

C.P. of Lehigh County, No. CR-4639-2014

*V. Paul Bernardino*, for Commonwealth.
*Karen Schular*, for defendant.

STEINBERG, *J.*, June 18, 2015—The defendant, Brian Creazzo, is charged with Homicide by Vehicle

While Under the Influence,[1] Homicide by Vehicle,[2] Accidents Involving Death or Personal Injury While Not Properly Licensed,[3] Involuntary Manslaughter,[4] Recklessly Endangering Another Person,[5] Driving Under the Influence of Alcohol or Controlled Substance,[6] and three (3) summary offenses.[7] It is alleged that the defendant, while under the influence of various controlled substances,[8] drove his Chevrolet 1500 into the rear of the victim's, Shane Uttard's, Buick LeSabre. Mr. Uttard was pinned between the two (2) vehicles causing multiple traumatic injuries and his death. It is also alleged that the speed of the defendant's vehicle at the time of impact was 61 m.p.h. The impact was described as a "straight on hit."[9] Mr. Uttard's vehicle was stationary due to being disabled, and was on the right shoulder of Route 22 at the time of his demise.

On April 9, 2015, counsel for the defendant filed a "Motion To Suppress Blood Test Results." The sole issue for consideration is whether the defendant, under the totality of the circumstances, voluntarily consented to the withdrawal of two (2) vials of blood at Lehigh Valley Hospital — Muhlenberg.[10] Hearings were held on this matter on April 27, 2015, and June 8, 2015, during which Trooper Anthony Liptok and Trooper Christopher Maner testified.

---

1. 75 Pa.C.S. § 3735(a).
2. 75 Pa.C.S. § 3732(a).
3. 75 Pa.C.S. § 3742.1(a).
4. 18 Pa.C.S. § 2504(a).
5. 18 Pa.C.S. § 2705.
6. 75 Pa.C.S. § 3802(d)(2).
7. 75 Pa.C.S. §§ 3309(1), 3361, 3736(a).
8. Notes of Testimony, Hearing (hereinafter N.T.H), January 20, 2015, pp. 67-69.
9. *Id.* at p. 34.
10. Motion To Suppress Blood Test Results, ¶¶ 14-15.

## Background

On May 13, 2014, Trooper Liptok arrived at the scene of this fatality, and learned that the defendant was in the rear of an ambulance. The two spoke briefly about the circumstances of this incident, and the defendant asked several times if the other individual was deceased. Trooper Liptok also asked the defendant if he was under the influence and the defendant said no.

The only testimony regarding the defendant's willingness to consent to have his blood secured was the following:

BY MR. BERNARDINO:

Q: Describe how you went about asking him for consent. What were you asking him to consent to?

A: As in any general investigation of a crash, I asked the operator of Unit 1 if there's medications prescribed or if he's under the influence of any medications and/or drugs or impairing substances. He said he was not. And then I further explained the severity of the crash, and it's common practice that police officers ask Unit 1, the operator of Unit 1, if they would submit to a voluntary blood draw and he advised he would.

(After Officer was handed his report)

THE COURT: Okay. Then, what did you explain to Mr. Creazzo?

THE WITNESS: Creazzo — I explained to Mr. Creazzo that based on the severity of the crash, that it's common practice that we — that we ask the operator of Unit 1 to

voluntarily submit to a blood draw.

Cross-Examination by Ms. Schular

BY MS. SCHULAR:

Q: Did you tell him he had a right to refuse consent?

A: Like I said, I just explained it's common practice. I didn't explain — I just basically explained that due to the severity — it's just what I said — it's common practice, in which he said yes right away.

Trooper Liptok described the defendant as "a little shaken up," but was capable of understanding all of his inquiries. Additionally, the defendant did have a cut on his head, but he refused treatment after he was evaluated by ambulance personnel. Thereafter, the defendant was accompanied to a state police vehicle for transportation to the hospital by Trooper Maner and another trooper. Prior to entering the vehicle, a pat-down of the defendant was conducted. Once the defendant was placed in the patrol vehicle, he could not get out of the vehicle, and while Trooper Maner did not remember if the defendant was handcuffed, regulations require handcuffing.

During the defendant's transportation by Trooper Maner, he was told that he was going to the hospital for a "voluntary blood." The defendant replied that he would not have any problem with blood being drawn because he had nothing in his system.

Neither Trooper Liptok or Trooper Maner saw any indication that the defendant was under the influence of alcohol or drugs.

## Discussion

The defendant disputes that he voluntarily consented to the testing of his blood.[11] In cases involving consent, there are two inquires: (1) the constitutional validity of the encounter between the police and the defendant;[12] and (2) if the encounter is lawful, the voluntariness of the

---

11. The defendant in his motion also contended that the police lacked probable cause to arrest him. The Commonwealth does not dispute this assertion, especially in light of the testimony from Trooper Liptok and Trooper Maner that they saw no signs of intoxication. Instead, the Commonwealth asserts the interaction between the defendant and the police was lawful, and he was not "seized." *Commonwealth v. Strickler*, 757 A.2d 884, 889 (Pa.2000)("[I]n assessing the lawfulness of citizen/police encounters, a central threshold issue is whether or not the citizen-subject has been seized. Instances of police questioning involving no seizure or detentive aspect (mere or consensual encounters) need not be supported by any level of suspicion in order to maintain validity). Here, the defendant was only transported to the hospital after he consented to the blood test. He was then taken to the state police barracks and then dropped-off at the Royal Motel. No charges were filed until September 9, 2014, almost four (4) months after Mr. Uttard's death.

In *Commonwealth v. Douglas*, 539 A.2d 412, 422-423 (Pa.Super. 1988), it was explained "that while a lawful arrest is ordinarily required before a suspect may be transported against his will, such an arrest is unnecessary when the suspect actually as opposed to impliedly consents to being transported...Consistent with other cases involving the consensual transportation of a suspect for questioning, testing or confirming of answers given to allay suspicions...the detention arriving from the consensual transportation of appellee to police barracks for a breathalyzer test did not constitute a custodial detention or arrest." *Id.* (citations omitted). Here, the defendant agreed to accompany Trooper Maner to the hospital. He was neither coerced nor forced to do so. The troopers were merely doing their due diligence in light of the fatality. Therefore, the defendant was not under arrest when he was transported to the hospital, and the encounter was lawful.

12. The defendant is not challenging the lawfulness of the encounter. The troopers were authorized to investigate this fatality, and determine the facts and circumstances. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification and request consent to search, provided they do not induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002); *Commonwealth v. Au*, 42 A.3d 1002, 1013 (Pa. 2012). Nothing presented at the hearings suggests there was anything coercive or confrontational about the encounter. *See Drayton*, 536 U.S. at 204.

consent to search. Here, the encounter was lawful, and so the consent to search becomes the exclusive focus. *Commonwealth v. Caban*, 60 A.3d 120, 125 (Pa.Super. 2012); *Commonwealth v. Bell*, 871 A.2d 267, 273 (Pa. Super. 2005); *Commonwealth v. Moultrie*, 870 A.2d 352, 359 (Pa.Super. 2005); *Commonwealth v. Lamonte*, 859 A.2d 495, 500 (Pa.Super. 2004).

Generally, police officers may not conduct a warrantless search or seizure unless an exception to the warrant requirement applies. "One such exception is consent, voluntarily given." *Bell*, 871 A.2d at 273. *See also Commonwealth v. Gillespie*, 821 A.2d 1221, 1225 (Pa. 2003); *Commonwealth v. Edwards*, 735 A.2d 723, 725 (Pa.Super. 1999). "To establish a voluntary consensual search, the Commonwealth must prove that a consent is the product of an essentially free and unconstrained choice — not the result of duress or coercion, express or implied, or a will overborne — under the totality of the circumstances." *Lamonte*, 859 A.2d at 500 quoting *Commonwealth v. Acosta*, 815 A.2d 1078, 1083 (Pa. Super. 2003); *see also Moultrie*, 870 A.2d at 359. Various factors have been identified in assessing the legality of a consensual search. The following is a non-exclusive list:

(1) the defendant's custodial status

(2) the use of duress

(3) the defendant's knowledge of his right to refuse to consent

(4) the defendant's education and intelligence

(5) the defendant's belief that no incriminating evidence will be found

(6) the extent and level of the defendant's cooperation with the law enforcement personnel

*See Commonwealth v. Gillespie*, 821 A.2d at 1225 quoting *Commonwealth v. Cleckley*, 738 A.2d 426, 433 n 7 (Pa. 1999). *See also Commonwealth v. Lamonte*, 859 A.2d at 500 n 4, which identifies the following non-exclusive list: (1) the presence or absence of police excesses; (2) physical contact or police direction of the subject's movements; (3) the demeanor of the police officer; (4) the location of the encounter; (5) the manner of expression used by the officer in addressing the subject; (6) the content of the interrogation or statements; (7) whether the subject was told that he or she was free to leave; and (8) the maturity, sophistication and mental or emotional state of the defendant (including age, intelligence and capacity to exercise free will). *Id. quoting Strickler*, 757 A.2d at 897-898; *Caban*, 60 A.3d at 127-128; *Commonwealth v. Kemp*, 961 A.2d 1247, 1261 (Pa.Super. 2008); Moultrie, 870 A.2d at 359 n 8 *citing Lamonte (quoting Strickler)*. *See also Commonwealth v. Dunne*, 690 A.2d 1233, 1236 (Pa.Super. 1997) *quoting Commonwealth v. Blasioli*, 685 A.2d 151, 156 (Pa.Super. 1996), which held the following factors were relevant: "the setting in which the consent was obtained; what was said and done by the parties present; and the age, intelligence, and educational background of the person consenting." *Id.*

More recently, in *Commonwealth v. Smith*, 77 A.3d 562 (Pa. 2013), which contains facts similar to the within case, it was held that "no one fact, circumstance, or element of the examination of a person's consent has talismanic significance." *Id.* at 569, 572. Therefore, an officer's failure to inform a defendant when seeking consent to test his blood, that the results may be used for criminal

or prosecutorial purposes does not require a finding under the totality of the circumstances that the consent is invalid. Likewise, the failure to inform an individual of their right to refuse consent to a warrantless search does not vitiate the consent. *Commonwealth v. Edwards*, 735 A.2d 723 (Pa.Super. 1999); *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-249 (1973)(Voluntariness is a question of fact to be determine from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent). Additionally, a consent search does not have to be memorialized by a signed written consent. *Commonwealth v. Gibbons*, 549 A.2d 1296, 1302 (Pa.Super. 1988) *quoting Commonwealth v. Markman*, 467 A.2d 336, 341-342 (Pa.Super. 1983)("... Consent searches are part of the standard investigating techniques of law enforcement agencies. They normally occur on the highway, or in person's home or office, and under informal and unstructured conditions).

In *Smith*, the police responded to an accident involving three vehicles, where upon their arrival, it was apparent that the occupants of one of the vehicles suffered serious injuries. One of the officers at the scene asked the appellee, "due to the seriousness of the accident with a potential fatality if he would submit to a chemical blood test." *Smith*, 77 A.3d at 565. The officer also told the appellee that he could refuse the test. The appellee agreed to the testing. The Supreme Court in its holding that there is no requirement that "police officers must explicitly inform drivers consenting to blood testing that the results of the test may be used against them in criminal prosecutions..." considered the totality of the

circumstances in finding the consent to be valid. *Id.* at 572. Furthermore, no per se rules or mandated explicit warnings are required before a consent can be upheld. The totality of the circumstances in *Smith* disclosed the aforementioned discussion with the appellee, and no evidence of any coercion or force on the part of the officer. The officer in *Smith*, like the troopers in this case, did not smell alcohol on the appellee.

Here, there was no deceit, misrepresentation, or coercion on the part of the troopers in seeking the defendant's consent for the blood testing. He was able to understand the troopers' request, and told them that he was not under the influence. Although he received a minor cut on his head, he refused treatment after he was evaluated by EMS personnel. The defendant was also well aware of the seriousness of the events, because he asked several times if the individual (Mr. Uttard) was deceased. As stated in *Smith*, "[o]n the basis of the totality of the evidence, when viewed objectively, ... a reasonable person's consent to this blood draw would have contemplated the potentiality of the results being used for criminal, investigative, or prosecutorial purposes." *Id.*, at 573.

A review of the non-exclusive list of factors also supports the conclusion the defendant's consent was "the product of an essentially free and unconstrained choice." *Id.* He was being evaluated by medical personnel and was not under arrest when he was asked to consent to the blood test. Although he was not told that he could refuse the blood test, did not sign a consent form, and this court knows little about his "maturity, sophistication, and mental or emotional state" at the time consent was requested, the totality of the circumstances still support the conclusion that the consent was valid.

The most important factor to support the validity of the consent was the defendant's belief that no incriminating evidence would be found. He responded to Trooper Maner's comment that he was going to be transported to the hospital for a "voluntary blood," by telling Trooper Maner that he would not have any problem with a blood draw because he had "nothing in his system." Those comments demonstrate voluntariness, and a complete awareness of the scope of the consent.

For all the foregoing reasons, the troopers validly obtained the defendant's consent for the blood test.

## ORDER

AND NOW, this 18th day of June, 2015, following hearings held in this matter and after consideration of the defendant's "Motion to Suppress Blood Test Results";

IT IS HEREBY ORDERED that said motion is DENIED.