J-A17040-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
  :   PENNSYLVANIA
                   Appellee   :

  :

                       v.   :

  :

RAMON PADILLA   :

  :

                   Appellant   :   No. 1110 EDA 2020

Appeal from the Judgment of Sentence Entered March 4, 2020
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0003828-2019

BEFORE: McLAUGHLIN, J., KING, J., and PELLEGRINI, J.[*]

MEMORANDUM BY KING, J.:            **FILED DECEMBER 29, 2021**

Appellant, Ramon Padilla, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his stipulated bench trial convictions for persons not to possess firearms, firearms not to be carried without a license, and carrying firearms on public streets or public property in Philadelphia.[1] We affirm.

The relevant facts and procedural history of this case are as follows. On the evening of April 17, 2019, Officers Ryan Redmond, Mark Wildsmith and Robert McGrody of the Philadelphia Police Department were on routine patrol on the 3100 block of E Street in Philadelphia. (N.T. Suppression Hearing,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 6105(a), 6106(a)(1), and 6108, respectively.

10/9/19, at 7). This area was known as a "high-drug and crime area; [with] lots of shootings" and a "lot of drugs sold on [this] block." (*Id.* at 10). At this time, Officer Redmond had served as a Philadelphia Police Officer for four years. (*Id.*) During their patrol, the officers observed a white Toyota Corolla driving northbound on E Street with dark-tinted windows. (*Id.* at 8). All the windows were illegally tinted except the windshield. (*Id.*) As a result of the tinted windows, the officers conducted a traffic stop. (*Id.*) Officers Redmond and McGrody approached the vehicle after it stopped. (*Id.* at 12).

The vehicle had three occupants. (*Id.*) Appellant was in the front passenger seat. (*Id.*) Officer Redmond approached the passenger's side door and he positioned himself on the passenger side of the vehicle between the front and back seat passenger. (*Id.* at 15). Officer Redmond testified that Appellant "kept on like adjusting his groin area, like trying to conceal something." (*Id.* at 8). In the meantime, one of the officers asked for all three of the occupants' identifications. (*Id.* at 18). The driver and Appellant complied with this request and provided their driver's licenses. (*Id.*) Officer Wildsmith took the licenses and returned to the patrol car to verify their information through a computer in the patrol car. (*Id.*)

After Officer Wildsmith returned to the patrol car from running the licenses, Officer Redmond had a conversation with Appellant. "And throughout that talk, [Appellant] kept on adjusting [his groin] again. So at that point [Officer Redmond] thought [Appellant] might have been concealing

something in his groin area consistent with a firearm." (*Id.* at 8). Officer Redmond explained that typically when he recovers concealed guns from an individual they are usually located in the subject's waistband without a holster. (*Id.* at 11).

In addition to his testimony, Officer Redmond's body cam was admitted as exhibit C-1 and viewed during the suppression hearing. (*Id.* at 12). The body cam, which included audio, captured only a portion of this stop. (*See* C-1 Body Cam). Officer Redmond's body cam includes the following interaction: Officer Redmond asked: "No weapons in the car?" (*Id.*) Nobody responded. (*Id.*) The officer then said "Nah?" (*Id.*) Again, none of the occupants responded. (*Id.*) Appellant failed to admit that he had a firearm on him, and instead he declined to answer. (*Id.*)

After viewing a portion of the body cam, Officer Redmond testified that "[i]n that clip [of the body cam] you can actually see [Appellant]'s—I think it was his left hand actually on his crotch area." (*Id.* at 14). Officer Redmond continued by testifying that "a few other times during the stop [Appellant] does the same thing, adjust his groin area."[2] (*Id.*) Officer Redmond believed Appellant might have a concealed firearm because he typically recovered guns from individuals "usually in their waistband." (*Id.* at 11). Officer Redmond elaborated on his training and experience as to why he thought Appellant's

---

[2] Most of the body cam footage does not show Appellant's hands or his lap.

adjusting his groin area was indicative of a concealed weapon as follows: "But usually over the course of your career you develop cues on body language movements that they make when they're concealing a firearm. So over my four years I've discovered that, you know, constant movements toward [the groin] area would indicate that they're probably hiding something." (*Id.* at 16).

During his conversation with Appellant, Officer Redmond asked what was inside a shoebox located at Appellant's feet. Appellant said shoes, and then showed them to the officer. (*Id.* at 19). After this interaction, the officer engaged the backseat passenger in conversation. (*Id.*) Officer Redmond then asked Appellant what was in his pocket, and Appellant removed a pill bottle which he showed the officer. (*Id.* at 20). Subsequently, Officer Redmond had a conversation with Officer Wildsmith, during which Officer Wildsmith informed Officer Redmond that the backseat passenger had an outstanding warrant for trespassing. (*Id.* at 24). In addition, the officers had a conversation about Appellant where they referenced Appellant as the "front-seat passenger." (*Id.* at 25). Neither officer could recall the content of that conversation. (*Id.* at 26, 37). Shortly after this conversation, Officer Redmond asked Officer Wildsmith to "pull [Appellant] out" of the car and then Officer Redmond stated "[l]et's check him out." (*Id.* at 27).

Officer Redmond testified that the reason he asked Appellant to step out of the car was "[a]fter watching [Appellant] adjust the groin area, I thought

- 4 -

[Appellant] was concealing a firearm." (*Id.* at 15). Further, Officer Redmond explained that the reason for waiting for Officer Wildsmith before requesting Appellant exit the car was that Officer Redmond "was waiting just in case [Appellant] tried to run or anything. We'd have more officers in the area or close to the area, so [Appellant] wouldn't get away." (*Id.* at 30). Officer Redmond reiterated his reason for waiting as follows: "I waited until he got out of the vehicle. So in case [Appellant] tried something, another officer would be right next to me to help me." (*Id.*) Immediately after Appellant exited the vehicle, Officer Redmond patted Appellant down and recovered a loaded handgun in Appellant's groin area. (*Id.* at 8-9).

On July 11, 2019, Appellant filed a motion to suppress. The court held a suppression hearing on October 9, 2019. At the conclusion of the hearing, the court denied the motion to suppress. On October 29, 2019, Appellant filed a motion for reconsideration. The court denied the reconsideration motion without a hearing on November 13, 2019. On November 15, 2019, the court convicted Appellant of the above-mentioned crimes after a stipulated waiver trial. On March 4, 2020, the court sentenced Appellant to an aggregate 18 to 36 months' imprisonment plus two years of probation. Appellant filed a timely notice of appeal on April 3, 2020. On May 26, 2020, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and Appellant timely complied. Following the grant of an extension of time, Appellant filed a supplemental Rule 1925(b) statement on

June 29, 2020.

Appellant raises the following issue for our review:

> Did the suppression court err in denying Appellant's motion to suppress the firearm recovered from his person as fruit of an unlawful frisk unsupported by reasonable suspicion that he was armed and dangerous where Appellant, a compliant passenger in a car lawfully stopped for a traffic violation, adjusted his groin a few times while speaking to police?

(Appellant's Brief at 3).

"Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct." *Commonwealth v. Williams*, 941 A.2d 14, 26 (Pa.Super. 2008) (*en banc*) (internal citations omitted).

> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

*Id.* at 27. The reviewing court's scope of review is limited to the evidentiary record of the pre-trial hearing on the suppression motion. *In re L.J.*, 622 Pa. 126, 79 A.3d 1073 (2013). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa.Super. 2019) (quoting *Commonwealth v. Clemens*, 66 A.3d 373, 378 (Pa.Super.

2013)). If appellate review of the suppression court's decision "turns on allegations of legal error," then the trial court's legal conclusions are nonbinding on appeal and subject to plenary review. ***Commonwealth v. Smith***, 164 A.3d 1255, 1257 (Pa.Super. 2017).

Appellant argues that although the police conducted a lawful traffic stop of the vehicle,[3] the officers lacked reasonable suspicion to perform a pat-down search for weapons. Appellant contends that he and the other occupants of the car complied with the officers' requests, did not act nervous, and did not attempt to flee. Appellant claims that Officer Redmond's testimony that Appellant adjusted his groin during his interaction with the officer did not support a belief that Appellant was armed and dangerous. Appellant emphasizes that his alleged movements toward his groin area are not seen on Officer Redmond's body cam video, which contradicts the officer's testimony. Further, Appellant asserts that Officer Redmond showed no concern for officer safety because the officer did not comment on Appellant's alleged movements during the traffic stop. Appellant highlights that Officer Redmond did not order Appellant out of the car immediately after he purportedly saw Appellant adjust his groin. Rather, Officer Redmond allowed Appellant to reach to the floor and open a shoebox. Appellant insists the officer's actions are inconsistent with his testimony that the officer believed Appellant could be armed and

_____

[3] Appellant concedes that the officers executed a lawful traffic stop based on the tinted windows. (***See*** Appellant's Brief at 15).

dangerous. Appellant reasons that Officer Redmond's observations consisted of a mere unparticularized suspicion or hunch, which was insufficient to warrant the serious intrusion of a pat-down search. Appellant concludes the trial court's suppression ruling was erroneous, and this Court should vacate the judgment of sentence and reverse the court's order denying his motion to suppress. We disagree.

The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures. *Commonwealth v. Morrison*, 166 A.3d 357, 363-64 (Pa.Super. 2017). "To secure the right of citizens to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." *Commonwealth v. Hampton*, 204 A.3d 452, 456 (Pa.Super. 2019). Because interactions between law enforcement and the general citizenry are widely varied, search and seizure law examines how the interaction is classified and if a detention has occurred. *Commonwealth v. DeHart*, 745 A.2d 633, 636 (Pa.Super. 2000).

The focus of search and seizure law "remains on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing

police to make limited intrusions on citizens while investigating crime."

***Commonwealth v. Moultrie***, 870 A.2d 352, 356 (Pa.Super. 2005) (quoting

***Commonwealth v. Blair***, 860 A.2d 567, 571 (Pa.Super. 2004)) (internal

quotation marks omitted). "[I]n assessing the lawfulness of citizen/police

encounters, a central, threshold issue is whether...the citizen-subject has

been seized." ***Commonwealth v. Strickler***, 563 Pa. 47, 57, 757 A.2d 884,

889 (2000).

Contacts between the police and citizenry fall within three general

classifications:

> The first [level of interaction] is a "mere encounter" (or
> request for information) which need not be supported by
> any level of suspicion, but carries no official compulsion to
> stop or to respond. The second, an "investigative detention"
> must be supported by a reasonable suspicion; it subjects a
> suspect to a stop and a period of detention, but does not
> involve such coercive conditions as to constitute the
> functional equivalent of an arrest. Finally, an arrest or
> "custodial detention" must be supported by probable cause.

***Commonwealth v. Goldsborough***, 31 A.3d 299, 305 (Pa.Super. 2011),

*appeal denied*, 616 Pa. 651, 49 A.3d 442 (2012) (quoting ***Commonwealth***

***v. Bryant***, 866 A.2d 1143, 1146 (Pa.Super. 2005), *appeal denied*, 583 Pa.

668, 876 A.2d 392 (2005)). Police must have reasonable suspicion that a

person seized is engaged in unlawful activity before subjecting that person to

an investigative detention. ***Commonwealth v. Cottman***, 764 A.2d 595

(Pa.Super. 2000).

> An investigative detention, unlike a mere encounter,
> constitutes a seizure of a person and thus activates the

protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

*    *    *

Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Jones*, 874 A.2d 108, 116 (Pa.Super. 2005) (internal citations omitted).

"[T]he question of whether reasonable suspicion existed at the time of an investigatory detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the individual stopped of criminal activity." *Cottman, supra* at 598-99 (quoting *Commonwealth v. Beasley*, 761 A.2d 621, 625-26 (Pa.Super. 2000), *appeal denied*, 565 Pa. 662, 775 A.2d 801 (2001)). "These circumstances are to be viewed through the eyes of a trained officer." *Commonwealth v. Jackson*, 907 A.2d 540, 543 (Pa.Super. 2006).

In making this determination, we must give due weight...to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience.

- 10 -

Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Young*, 904 A.2d 947, 957 (Pa.Super. 2006), *appeal denied*, 591 Pa. 664, 916 A.2d 633 (2006) (internal citations and quotation marks omitted).

Additionally,

If, during the course of a valid investigatory stop, an officer observes unusual and suspicious conduct on the part of the individual which leads him to reasonably believe that the suspect is armed and dangerous, the officer may conduct a pat-down of the suspect's outer garments for weapons. In order to establish reasonable suspicion [to conduct a pat-down], the police officer must articulate specific facts from which he could reasonably infer that the individual was armed and dangerous.

*Commonwealth v. Mack*, 953 A.2d 587, 590 (Pa.Super. 2008).

The *Terry*[4] totality of the circumstances test applies to traffic stops or roadside encounters in the same way that it applies to typical police encounters. *See Commonwealth v. Mesa*, 683 A.2d 643, 646 (Pa.Super. 1996). Moreover, the principles of *Terry* apply to all occupants of a stopped vehicle, not just the driver. *See id.* (applying principles of *Terry* to determine whether police were permitted to conduct pat-down search of passenger in

---

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1969) (holding police have authority to pat-down or frisk individual for weapons based upon reasonable belief that criminal activity is afoot, and that suspect might be armed and dangerous).

- 11 -

vehicle that was stopped pursuant to motor vehicle violation). Indeed, "roadside encounters, between police and suspects are especially hazardous, and that danger may arise from the possible presence of weapons in the area surrounding a suspect." *In re O.J.*, 958 A.2d 561, 564 (Pa.Super. 2008) (*en banc*) (citing *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)).

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." *Commonwealth v. Cooper*, 994 A.2d 589, 592 (Pa.Super. 2010), *appeal denied*, 608 Pa. 660, 13 A.3d 474 (2010). *See also Commonwealth v. Watley*, 153 A.3d 1034, 1045 (Pa.Super. 2016) (explaining that it was not relevant to reasonable suspicion inquiry that "neither of the troopers testified that they feared for their safety"; rather, relevant inquiry is objective reasonableness of search). The sole justification for the pat-down is the protection of the police officers and others nearby. *Commonwealth v. Cartagena*, 63 A.3d 294, 299 (Pa.Super. 2013) (*en banc*), *appeal denied*, 620 Pa. 728, 70 A.3d 808 (2013). The pat-down of an individual must be confined in scope to an intrusion reasonably designed to discover weapons. *Commonwealth v. Wilson*, 927, A2d 279, 285 (Pa.Super. 2007).

In *Commonwealth v. Simmons*, 17 A.3d 399 (Pa.Super. 2011), police pulled over a vehicle in a high crime area for inoperable brake lights. Simmons

was the passenger. The officer, a twelve-year veteran, saw Simmons make a movement toward the floor and across his chest. Accordingly, he conducted a pat-down search while the defendant was seated in the car and recovered several vials of cocaine. In analyzing whether the search was valid, this Court stated:

> Under such circumstances, we hold that [the officer's] observation of furtive movements, within the scope of a lawful stop, led him to reasonably be concerned for his safety and therefore justified the *Terry* protective frisk. Indeed, on multiple occasions we have held that similar furtive movements, when witnessed within the scope of a lawful traffic stop, provided a reasonable basis for a protective frisk.

*Id.* at 404.

Similarly, we have held that a defendant's "furtive movement of leaning forward and appearing to conceal something under his seat, along with his extreme nervousness and [a] nighttime stop, was sufficient to warrant a reasonable police officer to believe that his safety was in danger and that [the defendant] might gain immediate control of a weapon." *Commonwealth v. Buchert*, 68 A.3d 911, 916-17 (Pa.Super. 2013), *appeal denied*, 623 Pa. 759, 83 A.3d 413 (2014). *See also Commonwealth v. Foglia*, 979 A.2d 357, 361 (Pa.Super. 2009) (*en banc*) (stating "if a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress legitimacy of a protective weapons search of the location where hand movements occurred");

*O.J., supra* at 566 (holding police had reasonable suspicion where traffic stop

- 13 -

occurred at night, defendant initially failed to stop his vehicle when signaled by police, and defendant made "rapid and furtive hand movements over the [vehicle's] console," which had been left partially opened); *Commonwealth v. Tuggles*, 58 A.3d 840, 844 (Pa.Super. 2012) (explaining "[w]here a person performs an activity that is indicative of an attempt to secrete a weapon, that movement, regardless of whether it is singular or multiple, can support a belief that the person has a gun"); *Commonwealth v. Murray*, 936 A.2d 76, 80 (Pa.Super. 2007) (holding police had reasonable suspicion where traffic stop occurred at night and in high-narcotics area, defendant's vehicle had tinted windows, and defendant made "a lot of movement in the vehicle" as officer was approaching); *Commonwealth v. Jackson*, 907 A.2d 540 (Pa.Super. 2006) (recognizing that frisks for weapons can be appropriate when police confront suspect in area known for guns and violence).

A suspect's location in a high-crime area may be a factor supporting an officer's reasonable suspicion that criminal activity is afoot. *See Commonwealth v. Mackey*, 177 A.3d 221, 233 (Pa.Super. 2017). "This factor [of being located in a high-crime area] enhances the danger that police may encounter an armed subject in a fashion similar to, but greater than, a nighttime stop." *Commonwealth. v. Scarborough*, 89 A.3d 679, 683-84 (Pa.Super. 2014). Also relevant are the time of day, "[t]he danger of approaching a vehicle with tinted windows," and "excessive movement" within the car. *See Murray, supra* at 79-80.

We also observe that a video recording made part of the certified record may, in rare cases, contradict a trial court's factual findings that are based on credibility determinations. *See Commonwealth v. Griffin*, 116 A.3d 1139, 1143 (Pa.Super. 2015) (reversing trial court's denial of suppression motion on basis that officer's testimony alleging lawfulness of at-issue seizure of contraband was clearly contradicted by video evidence; stating "[t]his is one of those rare cases where a dash cam video, which was made a part of the certified record, can contradict a trial court's factual finding often based on its credibility determinations"). This Court subsequently clarified that the *Griffin* Court's analysis applies solely to situations where the video in question blatantly contradicts the officer's testimony such that we would be compelled to reject the trial court's credibility determination. *See Commonwealth v. Goral*, 222 A.3d 802 (Pa.Super. filed Oct. 3, 2019) (unpublished memorandum).[5]

Instantly, the court explained its reasoning for denying the motion to suppress as follows:

> … Officer Redmond testified that [Appellant's] left hand moved to his groin area multiple times during the vehicle stop. This [c]ourt was also shown body worn camera footage that showed [Appellant's] left hand near his groin. Officer Redmond believed [Appellant's] hand movement near his groin to be an attempt by [Appellant] to conceal a gun. … Officer Redmond, in his 4 years as a Philadelphia

---

[5] An unpublished non-precedential memorandum decision of the Superior Court filed after May 1, 2019, may be cited for its persuasive value. *See* Pa.R.A.P. 126(b)(1) and (2).

Police Officer, had recovered multiple firearms from individuals and in his experience, most recovered firearms were located in the waistband without a holster. Thus, Officer Redmond [had] reasonable suspicion to perform a frisk of [Appellant].

(Trial Court Opinion, filed 10/21/20, at 8). On this record, we see no reason to disrupt the court's credibility determination in favor of Officer Redmond.

Although Appellant contends that his alleged movements provided the sole basis for Officer Redmond's suspicion that Appellant was armed and dangerous (**see** Appellant's Brief at 13), the record shows that various factors existed to support reasonable suspicion: (1) Officer Redmond's four years' experience as a Philadelphia Police Officer, **see Jackson, supra**; (2) a roadside vehicle stop, **see In re O.J., supra**; (2) the stop occurred at nighttime, **see Buchert, supra**; (3) the vehicle had tinted windows, **see Murray, supra**; (4) the stop occurred in a high crime area, **see Simmons, supra**; (5) the area was known for gun violence, **see Jackson, supra**; (6) Appellant made furtive movements towards his groin, **see Tuggles, supra**; (7) Appellant's hand movements were associated with an area used for secreting a weapon, **see Foglia, supra**; and (8) the pat-down occurred for protection of the police officers, **see Cartagena, supra**.

Further, Appellant's argument that the body cam video contradicts Officer Redmond's testimony regarding Appellant's hand movements is unpersuasive. Even if other movements occurred that were not captured by the body cam, the trial court credited Officer Redmond's testimony that

- 16 -

Appellant "kept on like adjusting his groin area, like trying to conceal something." (Trial Court Opinion at 3). Notably, Officer Redmond's body cam footage did not begin until after the traffic stop was made and the police obtained the occupants' identification cards. (*See* N.T. Suppression Hearing at 13). As a result, the body cam footage did not capture Officer Redmond's initial interaction with Appellant and the car's other occupants. (*Id.*) The body cam is also positioned in the middle of the officer's chest and does not reveal everything that the officer observed. (*Id.* at 15). Regardless of whether Appellant's movements are depicted on the body cam footage, the trial court was free to credit Officer Redmond's testimony where the footage does not contradict that testimony. The record simply does not support Appellant's argument that the body cam footage blatantly contradicts Officer Redmond's testimony that he observed Appellant adjust his groin area several times, such that we should reject the trial court's credibility determination. *See Griffin, supra*; *Goral, supra*.

We also disagree with Appellant's assertion that Officer Redmond's actions contradict his testimony that he feared Appellant might be armed and dangerous. Although Officer Redmond did not immediately remove Appellant from the vehicle once he suspected that Appellant might be armed, Officer Redmond explained that he "was waiting just in case [Appellant] tried to run or anything. We'd have more officers in the area or close to the area, so [Appellant] wouldn't get away." (N.T. Suppression Hearing at 30). Officer

Redmond reiterated his reason for waiting as follows: "I waited until he got out of the vehicle. So in case [Appellant] tried something, another officer would be right next to me to help me." (*Id.*)

In light of this testimony, the record demonstrates that Officer Redmond suspected Appellant was concealing a firearm but wanted to wait for more officer assistance before immediately removing Appellant from the vehicle. The fact that Officer Redmond subsequently learned information from Officer Wildsmith during their conversation which provided additional reasons to justify the frisk did not negate the officer's concern for safety. Under these circumstances, Officer Redmond's observation of Appellant's repeated movements towards his groin, within the scope of a lawful stop, led him to reasonably be concerned for his safety and therefore justified the *Terry* protective frisk. *See Simmons, supra*. Accordingly, we affirm.

Judgment of sentence affirmed.

Judge McLaughlin joins this memorandum.

Judge Pellegrini files a dissenting memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/29/2021