**COMMONWEALTH of Pennsylvania,**
**Appellant**

**v.**

**Matthew BUCHERT, Appellee.**

Superior Court of Pennsylvania.

Submitted Feb. 19, 2013.

Filed April 12, 2013.

Reargument Denied June 24, 2013.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for appellant.

Karl Baker, Public Defender, Philadelphia, for appellee.

BEFORE: BOWES, GANTMAN, and MUSMANNO, JJ.

OPINION BY BOWES, J.:

The Commonwealth appeals from the trial court order suppressing the seizure of a firearm during a traffic interdiction.[1] We reverse.

The suppression court delineated the salient facts as follows.

---

1. In its notice of appeal, the Commonwealth certified that the order in question will terminate or substantially handicap its prosecution of Appellee. Hence, we have jurisdiction over this appeal. *See Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985); Pa.R.A.P. 311(d).

At approximately 12:15 a.m. on July 15, 2011, Officer [Edward] McConnell and his partner, Officer Shevlin, were on duty in the area of 3000 North 5th Street in Philadelphia. Around that time, Officer McConnell spotted a 1996 black Nissan Maxima traveling north on the 3000 block of North 5th Street with a broken tail light. Officer McConnell activated his overhead lights and pulled the Maxima over for the sole reason of having a broken tail light.

Officer McConnell, along with his partner, exited the police cruiser and began to approach the Maxima. Officer McConnell testified that as he approached the vehicle, he could see the defendant, Matthew Buchert, who was in the front passenger seat, bending forward and appearing to reach under the seat. However, Officer McConnell never saw the defendant's hands, and only witnessed "the defendant's shoulders bending forward." The defendant was seated in the front passenger seat and Officer McConnell approached from the driver's side. At the time it was dark outside and Officer McConnell was using a flashlight.

As the officers approached, they commanded the defendant and the driver, Kelly Collins, to keep still and make their hands visible. Both occupants were compliant and cooperative with the officers' instructions. Officer McConnell testified that the defendant appeared nervous as they were talking to him, and that he could see the defendant's heavy breathing and rapid heartbeat. At that point, Officer McConnell was still standing on the driver's side of the car and facing the defendant from a few feet away. One of the officers then instructed the defendant and the driver to exit the vehicle. Officer Shevlin performed a frisk on the defendant through which no contraband was recovered.

After the occupants were frisked, they remained with Officer Shevlin at the rear of the vehicle while Officer McConnell performed a search of the defendant's "immediate area of control." Officer McConnell began searching the vehicle, and stated that he could see the handle of a gun as he bent forward to look under the passenger seat. A black .22 caliber Colt revolver was recovered from underneath the passenger seat.

Officer McConnell described the area as a "high narcotics area." The Commonwealth offered no further evidence supporting the notion that this area was generally associated with a high degree of crime.[2] Officer McConnell testified

---

2. According to the Commonwealth, since the suppression court did not make factual findings under Pa.R.Crim.P. 581(I), a not uncommon practice, its later statement in its Pa. R.A.P. 1925(a) opinion that there was no corroborating evidence that the stop took place in a high crime area, was not a factual finding that the stop did not occur in a high crime neighborhood. However, the suppression court expressly stated at a later point in its decision, "The Court did not make any finding that this was a high crime area." Trial Court Opinion, 7/17/12, at 8.

It is abundantly evident from the suppression court's decision that it did not consider the area a high crime neighborhood and did not consider the officer's testimony, in this regard, credible. Indeed, after the suppression court stated that the Commonwealth "offered no evidence that this was a high-crime area, other than Officer McConnell's mere assertion of such a fact[,]" id., it included a footnote explicitly discussing credibility. See Trial Court Opinion, 7/17/12, at 8 n.2.

In an even more untenable argument, the Commonwealth maintains that a Pa.R.A.P. 1925(a) opinion is not part of the record, citing Pa.R.A.P. 1921. This statement is bizarre. Rule 1921 plainly supports the longstanding view that a Pa.R.A.P. 1925(a) opinion or order is part of the record. To the extent the Commonwealth misrepresents the law and attempts to misleadingly rewrite the

that when he saw the defendant "reaching," he believed the defendant was "placing something under the seat, possibly a weapon."

Trial Court Opinion, 7/17/12, at 2–4 (internal citations omitted).

Immediately following the suppression hearing, the court ruled that the search was unlawful because the police did not possess probable cause to search the passenger area. The court relied principally on our decision in *Commonwealth v. Reppert*, 814 A.2d 1196 (Pa.Super.2002) (*en banc*). The Commonwealth appealed, and the court directed it to comply with Pa. R.A.P. 1925(b). The Commonwealth complied and the court authored its Pa.R.A.P. 1925(a) opinion. The matter is now ripe for our review. The Commonwealth presents one question for our consideration.

> Where police officers conducted a valid traffic stop of a car in which defendant was a passenger and, as the officers approached the car, defendant bent forward and reached under the seat, then appeared very nervous, did the lower court err in suppressing the gun found under defendant's seat during a protective search of the area within his immediate control?

Commonwealth's brief at 3.

■ The Commonwealth relies principally on *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) and *Commonwealth v. Morris*, 537 Pa. 417, 644 A.2d 721 (1994). In *Morris*, our Supreme Court adopted the standard for assessing the constitutionality of a protective search of the interior of a car for weapons set forth in *Long*. In *Long*, the Supreme Court extended the *Terry*-stop doctrine, allowing protective searches of a person's body

based on reasonable suspicion that the person may be armed, to searches of the passenger compartment of a car. The *Long* Court specifically rejected the contention that a protective search of the interior of a car is unreasonable where the person is under police supervision outside the vehicle. It noted that a suspect who is not placed under arrest will be free to leave and "reenter his automobile, and he will then have access to any weapons inside." *Long, supra* at 1051, 103 S.Ct. 3469.

In a series of more recent cases, this Court has applied the *Long/Morris* standard. *See Commonwealth v. Cartagena*, 2013 PA Super 12, 63 A.3d 294 (*en banc*); *Commonwealth v. Boyd*, 17 A.3d 1274 (Pa.Super.2011), *Commonwealth v. Simmons*, 17 A.3d 399 (Pa.Super.2011), *In re O.J.*, 958 A.2d 561 (Pa.Super.2008) (*en banc*), and *Commonwealth v. Murray*, 936 A.2d 76 (Pa.Super.2007).

This Court in *Cartagena, supra*, affirmed a decision to suppress a firearm seized from a center console after a stop based on illegal window tinting, despite concluding that the suppression court's probable cause analysis was incorrect. There, police conducted a traffic stop of a Chevrolet Suburban at 1:50 a.m. on Lehigh Avenue, Philadelphia. The officer therein testified that the windows were so dark that he could not see inside the vehicle, even with the aid of a flashlight. He and his partner requested that the driver lower his window. The driver did not comply immediately and police asked again. After being asked the second time, the driver lowered his window. When police requested his license, registration, and insurance information, he opened his center console and became extremely nervous before clos-

record, we remind it of its duty of candor and caution it from making such frivolous argu-

ments in the future.

ing it. He then retrieved the registration and insurance documents from his glove box. Due to the extreme nervousness of the driver, police asked that he alight from his vehicle. A pat-down search ensued, which revealed nothing. However, police recovered a loaded .32 caliber handgun from the center console.

The suppression court in *Cartagena* concluded the search was unlawful, though, as noted earlier, it did so based on legally erroneous grounds. Specifically, it believed police needed probable cause to conduct a protective weapons search and that exigent circumstances beyond the mobility of the car was necessary to support the search. This Court affirmed, noting that the suppression court's legal conclusions were not binding and that we could affirm on any grounds.

The *Cartagena* Court set forth that there was no testimony that the stop occurred in a high crime area. The Court opined that extreme nervousness combined with tinted windows and a night time stop were insufficient to justify the search of the console. We highlighted that there was no evidence that the defendant did not immediately stop, that officers saw weapons before searching the car, or that the occupant made any movements inside the vehicle.

In contrast, in *Boyd*, shortly after midnight, two Philadelphia police officers conducted a traffic stop in a high crime area after observing a vehicle stopped at an intersection sit through two green lights and flash its high beams at traffic. After being pulled over, one officer witnessed the driver lean over and reach into the center console. The officers then asked both the driver and his passenger to exit the vehicle. A pat-down search by police did not reveal any weapons. The officer directed the driver to stand behind the car and proceeded to open the center console.

Inside the console was crack cocaine. The suppression court suppressed the seizure of the drugs from the console and the Commonwealth appealed. The *Boyd* Court surveyed *Murray* and *In re O.J.*, and reversed. The Court determined that the high crime area, the movement in the car, and the car remaining stopped through multiple green lights and flashing its high beams justified the protective weapons search.

In *Simmons*, Philadelphia police pulled over a vehicle in a high crime area for inoperable brake lights. Simmons was the passenger. The officer, a twelve-year veteran, saw Simmons make a movement toward the floor and across his chest. Accordingly, he conducted a pat-down search while the defendant was seated in the car and recovered several vials of cocaine. The panel opined,

> Under such circumstances, we hold that [the officer's] observation of furtive movements, within the scope of a lawful stop, led him to reasonably be concerned for his safety and therefore justified the *Terry* protective frisk. Indeed, on multiple occasions we have held that similar furtive movements, when witnessed within the scope of a lawful traffic stop, provided a reasonable basis for a protective frisk.

*Simmons, supra* at 404. We continued, distinguishing our en banc decision in *Reppert, supra*, reasoning:

> When properly understood, *Reppert* stands for the proposition that pre-stop furtive movements, by themselves, may not be used to justify an investigative detention and search commenced after the conclusion of a valid traffic stop where the totality of circumstances has established that the furtive movements did not raise immediate concern for the

safety of the officer who undertook the initial vehicle detention.

*Id.* at 405.

In *Murray,* police stopped a Range Rover in a high crime area in Philadelphia for failing to use a turn signal. The stop occurred at approximately 9:15 p.m. When one of the officers exited his vehicle, he shined a light into the car. Due to tinted windows, he was unable to discern precisely what the defendant was doing, but noticed a large amount of movement. Accordingly, he asked the defendant to alight from the vehicle and frisked him. The search revealed nothing; however, the officer found a loaded .40 caliber Glock semiautomatic handgun after opening the center console armrest. On appeal, the defendant argued that the search was unlawful. The panel disagreed, relying on *Long, supra* and *Morris, supra.* The *Murray* Court found that "knowledge of the neighborhood being a well-known narcotics area, when coupled with the excessive movement inside the vehicle and hour of night, raised serious and obvious safety concerns that justified a search for weapons." *Murray, supra* at 80.

In *In re O.J.,* Philadelphia police attempted to pull over a vehicle around 8:00 p.m. for speeding and failing to stop at a stop light. The driver initially did not stop. Once the driver did come to a stop, the officers observed arm and hand movements over the center console. The two occupants of the car were removed, searched, and placed in the police cruiser. A search of the center console yielded cocaine. The suppression court determined that the police acted unlawfully since the defendant was in the back of the police cruiser. We reversed, reasoning,

> The vehicular stop occurred at night, which creates a heightened danger that an officer will not be able to view a suspect reaching for a weapon. Appellee had been driving dangerously and initially refused to heed police efforts to stop his car. This evasive behavior supported Officer Tucker's fear that Appellee may have been engaged in criminal behavior and in possession of a weapon. Finally, Appellee's rapid and furtive hand movements over the console indicated that he may have been hiding a weapon in that location.

*In re O.J., supra* at 566.

The Commonwealth herein argues that because the stop occurred late at night in an alleged high crime area and the defendant reached under his seat before exhibiting extreme nervousness, the officers had reasonable suspicion to conduct a protective weapons search of the passenger seat area. It highlights that in *Commonwealth v. Micking,* 17 A.3d 924 (Pa.Super.2011) (*en banc*) (Opinion in Support of Affirmance), an equally divided panel of this Court upheld a search of a locked glove compartment where the individual was noticeably trembling and extremely nervous during a routine traffic stop. Although acknowledging that *Micking* is non-precedential, it points out that the opinion in support of reversal agreed that extreme nervousness may give rise to reasonable suspicion. The Commonwealth further distinguishes *Reppert, supra,* by correctly noting that the issue in *Reppert* was whether a second interaction with the motorist occurred after the initial traffic stop, not whether furtive movements and nervousness led to reasonable suspicion in the first instance.

Appellee counters that he did not make repeated or rapid furtive movements and, even assuming his bending forward is a furtive movement, such movement in combination with nervousness does not "constitute reasonable suspicion." Appellee's brief at 5. In support, Appellee relies on *Commonwealth v. Moyer,* 954 A.2d 659

(Pa.Super.2008) (*en banc*) and its citation to *Reppert, supra*. In *Moyer*, state troopers conducted a traffic stop at approximately 11:20 p.m. based on a broken tail light. The troopers observed excessive movement between the driver and passenger "focused down towards the floor boards and toward the passenger side of the vehicle." *Id.* at 661. The driver, Moyer, appeared nervous and had bloodshot eyes. Accordingly, the officer ran a criminal check and discovered that Moyer had been arrested for possession of marijuana.

The officer then issued a warning for the tail light and directed Moyer to exit the vehicle. He showed Moyer the broken tail light and instructed him to have it repaired. The officer next informed Moyer he was free to leave. However, when Moyer reached his door, the officer asked if Moyer could answer some additional questions. Ultimately, Moyer consented to a search of his car and a crack pipe was recovered. The trial court suppressed the evidence and this Court affirmed. We first reasoned that there were two separate traffic interdictions and that the initial stop ended when Moyer was told that he could leave. Next, we held that the second interaction with the troopers was not supported by reasonable suspicion. Finally, we stated, "[f]urtive movements and nervousness, standing alone, do not support the existence of reasonable suspicion." *Id.* at 670.

We begin by rejecting the Commonwealth's assertion that the stop occurred in a high crime area. *See* footnote two, *supra*. Here, viewing the facts as determined by the suppression court, the stop occurred shortly after midnight, the passenger leaned down and reached under his seat, and exhibited extreme nervousness when approached by police. However, we agree that the suppression court plainly applied the wrong standard in seeking to determine whether probable cause and exigent circumstances existed. *See Cartagena, supra* at 300 n. 13.

The proper inquiry is whether, under the totality of the circumstances, police possessed reasonable suspicion to conduct a *Terry* protective weapons search. We find that this case is distinguishable from *Moyer* and that the police did have reasonable suspicion to perform the protective weapons search. *Moyer* is inapposite insofar as the troopers therein did not perform a protective weapons search based on their observations. Instead, they did not believe that Moyer posed any danger and issued a citation. The troopers then engaged in a second *Terry*-stop and received consent to search the car. The legal discussion in *Moyer* was focused on the coercive nature that precluded the consent from being voluntary. Similar to *Simmons, supra*, where we distinguished *Reppert, supra*, the above-quoted sentence from *Moyer* "stands for the proposition that pre-stop furtive movements, [and extreme nervousness] by themselves, may not be used to justify an investigative detention and search commenced after the conclusion of a valid traffic stop where the totality of circumstances has established that the furtive movements [and nervousness] did not raise immediate concern for the safety of the officer who undertook the initial vehicle detention." *Simmons, supra* at 405.

Further, although this Court recently held in *Cartagena* that a night time stop where extreme nervousness was exhibited did not give rise to reasonable suspicion to perform the protective weapons search therein, *Cartagena* did not involve furtive movements. Indeed, the *Cartagena* Court expressly acknowledged that the occupant did not make any movements inside the vehicle. The combination of Appellee's furtive movement of leaning forward and

appearing to conceal something under his seat, along with his extreme nervousness and the night time stop, was sufficient to warrant a reasonable police officer to believe that his safety was in danger and that Appellee might gain immediate control of a weapon. *See Simmons, supra.* Accordingly, we reverse.

Order reversed. Case remanded. Jurisdiction relinquished.