J-S27013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
:          PENNSYLVANIA
              Appellant    :
:
:
:
               v.          :
:
:
:
MALCOLM LINDSAY          :   No. 2908 EDA 2023

Appeal from the Order Entered November 6, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004171-2022

BEFORE:   LAZARUS, P.J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:       **FILED SEPTEMBER 27, 2024**

The Commonwealth of Pennsylvania (Commonwealth) appeals from the

order, entered in the Court of Common Pleas of Philadelphia County, granting

Appellee Malcolm Lindsay's motion to suppress[1] a gun seized from his person.

Based upon the testimony at the suppression hearing, as well as careful review

of police officer body camera video[2] of the incident in question, we conclude

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Commonwealth has certified that the suppression order terminates or
substantially handicaps the prosecution of this case.  **See** Pa.R.A.P. 311(d);
**Commonwealth v. Dugger**, 486 A.2d 382 (Pa. 1985).

[2] On April 26, 2024, the Commonwealth filed a motion to correct an omission
in the record, pursuant to Pa.R.A.P. 1926, requesting that our Court direct
that the certified record be supplemented to include the thumb drive of
Philadelphia Police Officer Marc Kusowski's body-worn camera footage of the
event, which was marked and moved into evidence at the suppression
hearing, without objection, as Commonwealth Exhibit C-1.  On May 31, 20024,
*(Footnote Continued Next Page)*

that the record does not support the trial court's factual findings and that the legal conclusions drawn from those findings were in error. Accordingly, we reverse and remand.

In April 2022, Lindsay was arrested and charged with carrying a firearm without a license[3] and carrying a firearm on the streets of Philadelphia.[4] The charges were the result of an incident that occurred when uniformed Officer Kusowski observed the handle of a pistol protruding from Lindsay's waistband.

Lindsay filed a pre-trial motion to suppress the evidence uncovered from the April 2022 incident claiming that the firearm was unconstitutionally seized from him because the officers lacked any reasonable suspicion to detain or probable cause to arrest him. On November 1, 2023, the court conducted a suppression hearing, at which time the Commonwealth presented the uncontradicted testimony of Officer Kusowski, who testified that he had made more than 300 firearm violation arrests, was able to recognize firearms, and

_____

this Court granted the motion. Thus, the record has been supplemented with the exhibit for purposes of our appellate review.

[3] Pursuant to 18 Pa.C.S.A. § 6106, a county-issued license is required to carry a firearm "concealed on or about" one's person.

[4] *Id.* at § 6108. Unique to The City of Philadelphia, the Commonwealth's sole city of the first class, persons are required to have a license to carry a firearm openly on one's person. We recognize that the constitutionality of section 6108 is currently being challenged in this Court in an unrelated appeal. *See* ***Commonwealth v. Sumpter***, 2271 EDA 2023. However, since that decision has not yet been handed down and Lindsay has not raised that issue on appeal, we need not address it.

- 2 -

knew, what a Glock, the type of pistol recovered from Lindsay, looked like. *See* N.T. Suppression Hearing, 11/1/23, at 11-12.

At the hearing, Officer Kusowski testified that on April 15, 2022, while he was patrolling the 3500 block of Germantown Avenue with his partner in their marked patrol vehicle, he observed Lindsay walking in the street with his young child. *See id.* at 6-8, 13. Officer Kusowski testified that he "could see the handle of a black Glock [protruding from Lindsay's right front pants] pocket." *Id.* at 7. Officer Kusowski, who was a passenger in the patrol vehicle and, at this point, "extremely close" to Lindsay on the street,[5] had his partner stop the vehicle. Officer Kusowski then opened his door and asked Lindsay if he had a permit to carry a firearm. *Id.* at 8, 16. Officer Kusowski testified that Lindsay replied, "Oh, shit, oh shit," then turned around and started walking back toward the patrol vehicle. *Id.* Officer Kusowski then repeated the question and asked Lindsay whether he had a permit and Lindsay replied, "no, no, no. Hold up." *Id.* Officer Kusowski testified "with [Lindsay having] initial[ly] turn[ed] his body and [having] sa[id] 'oh, shit,' [that he] now . . . suspect[ed] that [Lindsay didn't] have a permit. [So, the officer] ask[ed] him a third time, [and Lindsay said], 'No, I don't, but it's legal.'" *Id.*

At that point, Officer Kusowski testified that since Lindsay admitted he did not have a permit to legally carry the gun, he placed Lindsay under arrest.

_____

[5] As is evidenced in the officer's body camera video, contrary to defense counsel's claim at the suppression hearing, Officer Kusowski never physically touched Lindsay prior to having probable cause to arrest him.

*Id.* at 17. A loaded Glock 19, with fourteen live rounds in the magazine and one in the chamber, was recovered from Lindsay's person. *Id.* at 12. At no point during the encounter did the officer use an authoritative tone or activate the police vehicle's lights or siren. *Id.* at 9. At the conclusion of the hearing, the trial judge took the matter under advisement to review the record and relevant case law. Five days later, on November 6, 2023, the court issued its decision, in open court, and granted Lindsay's motion to suppress.

The Commonwealth filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The Commonwealth presents one issue for our consideration: "Did the [trial] court err by suppressing a gun where, upon being approached on the street and asked if he had a permit, [Lindsay] responded, 'oh, shit,' and then admitted that he did not?" Commonwealth's Brief, at 3.[6]

> When the Commonwealth appeals from a suppression order, an appellate court follows a clearly defined standard of review and considers only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Miller*, 56 A.3d 1276, 1278-79 (Pa. Super. 2012) (citations omitted).

_____

[6] Lindsay has not filed an Appellee's brief on appeal.

Relying on our Supreme Court's decision, **Commonwealth v. Hicks**, 208 A.3d 916 (Pa. 2019), the trial court granted suppression based upon the following conclusions: Lindsay was subject to an investigatory detention; a reasonable person in Lindsay's situation would not believe he was free to terminate the encounter and leave the scene; and, other than seeing the handle of a Glock protruding from Lindsay's pocket, Officer Kusowski did not have any reason to suspect Lindsay of criminal activity. **See** N.T. Suppression Ruling, 12/6/23, at 7.[7]

In **Hicks**, our Supreme Court overruled long-established precedent, otherwise known as "the **Robinson**[8] rule," holding that "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach an individual and briefly detain him in order to investigate whether the person is properly licensed." **Hicks**, 208 A.3d at 921, citing **Robinson**, 600 A.2d at 959. The **Hicks** Court concluded that the **Robinson** rule "contravenes the requirements of the **Terry**[9] doctrine, and[,] thus[,]

---

[7] Central to its determination that the officer's stop was illegal, the trial court found that "Officer [Kus]owski followed[,] asking Mr. Lindsay[] a total of four times[,] if he had a permit within the first six seconds of having encountered Mr. Lindsay. Mr. Lindsay responded that the gun was legal as Officer [Kus]owski placed him under arrest." **Id.** at 6.

[8] **Commonwealth v. Robinson**, 600 A.2d 957 (Pa. Super. 1991).

[9] **Terry v. Ohio**, 392 U.S. 1 (1968).

subverts the fundamental protections of the Fourth Amendment[.]" *Hicks*, 208 A.3d at 921.

In *Hicks*, a remote camera operator, conducting live surveillance of a gas station and convenience store in Allentown, notified the police that he observed an individual show a firearm to another patron of the convenience store, put the firearm in his waistband, cover the gun with his shirt, and then walk inside the store. *Id.* at 922. Hicks left the store and re-entered his vehicle, at which time, police responded to the scene. "Before Hicks could exit [the convenience store] parking lot, numerous police officers in marked vehicles intercepted and stopped [his] vehicle. [Then, b]elieving Hicks had moved his hands around inside the vehicle, [an o]fficer [] drew his service weapon . . . and ordered Hicks to keep his hands up." *Id.* Hicks' arms were then restrained while an officer retrieved Hicks' gun from his holster, removed him from his vehicle, and handcuffed him. *Id.* The officers immediately noticed the smell of alcohol emanating from Hicks, searched him, and discovered a small bag of marijuana on his person. *Id.*

Although the officers subsequently determined that Hicks was licensed to carry a concealed firearm, he was charged with two driving while under the influence of alcohol (DUI) offenses, possession of a small amount of marijuana, and disorderly conduct. Hickes proceeded to a non-jury trial, and was found guilty of one DUI count and sentenced to 30-60 days in jail.[10] *Id.*

---

[10] *Hicks* was not charged with any firearm offenses.

at 922-23. On appeal, the Supreme Court vacated Hicks' judgment of sentence, concluding that "Hicks was [unconstitutionally] seized solely due to the observation of a firearm concealed on his person." ***Id.*** at 951.

Although the Supreme Court overruled the ***Robinson*** rule in ***Hicks***, the Court did find that the police may consider contextual factors to reasonably suspect that an individual's possession of a gun is illegal. ***See Hicks***, 208 A.3d at 938-39 (recognizing firearm possession may be suspicious in light of other factors, such as presence in high-crime area). Factors that are otherwise innocent, which can combine to support reasonable suspicion, include angling one's body away from the police, ***Commonwealth v. Carter***, 105 A.3d 765, 775 (Pa. Super. 2014) (en banc); ***Commonwealth v. Keys***, 301 A.3d 929 (Pa. Super. 2023) (Table),[11] making furtive movements with extreme nervousness, ***Commonwealth v. Buchert***, 68 A.3d 911, 916-17 (Pa. Super. 2013), and adjusting a waistband immediately upon seeing a police car. ***Keys***, ***supra***.

Warrantless police-citizen interactions fall within three general categories:

> The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to

_____

[11] ***See*** Pa.R.A.P. 126(b) (non-precedential decisions filed after May 1, 2019, may be cited for persuasive value).

- 7 -

constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

\* \* \*

During a mere encounter, "[a]s long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification."

In evaluating whether an interaction constitutes a mere encounter, we must consider "all circumstances evidencing a show of authority or exercise of force, including the demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements." *Commonwealth v. Parker*, [] 161 A.3d 357, 363 (Pa. Super. 2017). The following non-exclusive list of factors are also relevant to the inquiry:

> [T]he number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Id.*

Further:

> An investigative detention, unlike a mere encounter, constitutes a seizure of a person and thus activates the protections of Article 1, Section 8 of the Pennsylvania Constitution. To institute an investigative detention, an officer must have at least a reasonable suspicion that criminal activity is afoot. Reasonable suspicion requires a finding that[,] based on the available facts, a person of reasonable caution would believe the intrusion was appropriate.

\* \* \*

> Reasonable suspicion exists only where the officer is able to articulate specific observations which, in conjunction with reasonable inferences derived from those observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of intrusion warrant a [person] of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Rice*, 304 A.3d 1255, 1260-61 (Pa. Super. 2023) (some citations omitted).

Here, the officers did not engage their vehicle's sirens or lights, brandish their weapons, position themselves to impede Lindsay's ability to continue walking away, tell Lindsay that he was not free to leave, or threaten consequences for non-compliance. *Accord Rice*, *supra*; *Commonwealth v. Newsome*, 170 A.3d 1151, 155-56 (Pa. Super. 2017). Officer Kusowski's demeanor and tone of voice remained non-confrontational the entire time he questioned Lindsay about whether he had a permit for the gun, with the interaction lasting a total of ten seconds. *See Rice*, *supra* at 1262 (no evidence of record that officer's tone of voice and surrounding circumstances communicated to defendant he was not free to leave or decline officer's request). Despite these facts, which are supported by the record, the trial court concluded that Lindsay was subjected to an investigative detention.[12] We disagree.

_____

[12] The trial court made the following factual findings following the suppression hearing:
*(Footnote Continued Next Page)*

Where there is no evidence that Officer Kusowski's tone of voice or the surrounding circumstances could reasonably have led Lindsay to believe that he was not free to leave or decline the officer's request, we find that, under the circumstances, the parties' initial interaction was a mere encounter. *Cf. Hicks, supra* at 922, 950 (defendant's initial interaction with police involved "numerous police officers in marked vehicles intercept[ing] and stop[ping

_____

On April 15, 2022, Officer [Kus]owski and his partner were driving on the 3500 block of Germantown when they saw [] Lindsay walking with his young [child]. Officer [Kus]owski testified that [] Lindsay was in the middle of the street with his back to them, and a handle of a firearm was visible from his pocket. The officer stopped the patrol car a short distance from [] Lindsay. Body camera footage showed Officer [Kus]owski opening his patrol car door and immediately asking if [] Lindsay had a permit to carry a firearm. [] **Lindsay began to walk away without giving a definitive answer. Officer [Kus]owski followed**[,] **asking [] Lindsay a total of four times if he had a permit within the first six seconds of having encountered [] Lindsay.** [] Lindsay responded that the gun was legal as Officer [Kus]owski placed him under arrest. The entire exchange from the initial contact to the arrest lasted approximately ten seconds.

\* \* \*

[] Linds[a]y was walking away from Officer [Kus]owski when the officer first asked if he had a permit to carry. **Officer [Kus]owski followed** [] **Lindsay continuously inquiring about a permit to carry until** [] **Lindsay stopped and turned around.**

[] Linds[a]y was still speaking to Officer [Kus]owski when the officer first touched him and handcuffed him almost immediately. All of this occurred within ten seconds of Officer [Kus]owski opening his patrol car door.

N.T. Suppression Ruling, 12/6/23, at 5-7 (emphasis added).

defendant's] vehicle with their lights flashing," as defendant begins to pull away from gas pump).  As in *Rice*, *supra*, Lindsay would not reasonably feel compelled to stop based on Officer Kusowski's inquiry as to whether he had a permit to carry, and, in fact, Lindsay did not stop but continued to walk away from the officers further into the street.  *See* Commonwealth Exhibit 1 (C-1), at 1:00-1:01 (video camera footage shows upon officer's initial approach, marked police cruiser pulls alongside Lindsay and child,[13] officer rolls down passenger-side window and opens door, asks Lindsay, in calm, non-threatening tone, "you got a permit to carry, buddy?" and Lindsay continues to walk away while responding, "huh?"); *see also* N.T. Suppression Ruling, 11/6/23, at 6 (trial court stating, "Lindsay was walking away from Officer [Kus]owski when the officer first asked if he had a permit to carry.").

Moreover, after Officer Kusowski asked Lindsay a second time, still in a calm tone, "do you have a permit to carry?," *id.* at 1:02, and Lindsay, who continues to walk away, responded, "[a]hhh, [s]hit," *id.* at 1:03, Officer Kusowski had reasonable suspicion to justify further investigation as to whether Lindsay was legally carrying the gun.  Then, when Officer Kusowski asked Lindsay a third time, "Do you have a permit to carry, man," *id.* at 1:04, Lindsay responded, "[u]ghhhh." *Id.* at 1:05.  In a continued effort to find out whether Lindsay possessed the weapon legally, Officer Kusowski asks him a

---

[13] The body camera footage does not reveal whether Lindsay is standing or walking when the cruiser first pulls up.  *Id.* at 0:59-1:00.

fourth time, "do you have a permit to carry a firearm." *Id.* at 1:07. When Lindsay replied, "**Nah**, it's legal, it's legal though, it's legal, it's legal," *id.* at 1:08 (emphasis added), the officer had probable cause to arrest Lindsay for admitting that he was carrying a firearm without a license.[14]

Accordingly, we conclude that, based upon a totality of the evidence, suppression was improper. *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010) (citation omitted) (unlike deference given to suppression court's factual findings, "we maintain *de novo* review over the suppression court's legal conclusions").[15] Officer Kusowski's initial interaction with Lindsay is

_____

[14] Despite his response that he did not have a permit to carry the gun, in an abundance of caution, Officer Kusowski specifically asks Lindsay, "but you don't have a permit?" and Lindsay replies, "nah." *Id.* at 1:10.

[15] The trial court factually found that the first time Officer Kusowski asks Lindsay whether he has a permit to carry the gun, "Lindsay began to walk away without giving a definitive answer." N.T. Suppression Ruling, 11/6/23, at 6. In fact, Lindsay's exact response was "huh," indicating he either didn't hear the officer or didn't understand his question. In any event, both the trial court and the officer factually agree that Lindsay continued walking away after this initial interaction, showing that Lindsay did not feel compelled to stop— the hallmark of a mere encounter. Then, the trial court states in its suppression decision that Officer Kusowski followed Lindsay, "asking [him] a total of four times if he had a permit within the first six seconds of having encountered [] Lindsay [and that] Lindsay responded that the gun was legal as Officer [Kus]owski placed him under arrest." *Id.* By failing to break down the events that occurred over the entirety of the ten second encounter between the officer and Lindsay, the court's legal analysis is fundamentally flawed and leads to an incorrect decision. Although the officer's body camera footage confirms that the "entire exchange from the initial contact to the arrest lasted approximately ten seconds," *id.*, the brief duration of the encounter does not mean that it was not legally justified. Moreover, by stating that "Officer [Kus]owski followed [] Lindsay continuously inquiring about a permit to carry until Mr. Lindsay stopped and turned around," *id.*, the court

*(Footnote Continued Next Page)*

- 12 -

properly classified as a mere encounter, requiring no level of individualized suspicion. *See Newsome*, 170 A.3d at 1156 (interaction classified as mere encounter where lieutenant, without activating police cruiser's lights or siren, asked defendant to stop **two or three times** without threatening any consequences for non-compliance, did not use authoritative tone, and did not brandish weapon or show force). Following the parties' first exchange, Lindsay's response, "ahhh, shit," gave Officer Kusowski reasonable suspicion to detain Lindsay and determine whether he possessed the gun legally. *See Commonwealth. V. Jackson*, 302 A.3d 737, 749 (Pa. 2023) ("[S]uspicious conduct by its very nature is ambiguous, and the principal function of the investigative stop is to quickly resolve that ambiguity.") (citation omitted). Then, just four seconds later, the officer's suspicion turned into probable cause to arrest when Lindsay admitted he did not have a permit to carry a gun.

Order reversed. Case remanded. Jurisdiction relinquished.

---

paints a picture of an officer badgering Lindsay, and fails to acknowledge the incriminating responses that Lindsay gave to the officer, and the fact that the officer never exhibited force, used a confrontational tone, or touched Lindsay until Lindsay admitted he did not have a permit for the gun—all of which is captured on Officer Kusowski's body camera footage.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/27/2024