J-A27024-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MAURICE CUNNINGHAM | : | No. 2560 EDA 2024 |

Appeal from the Order Entered September 17, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003605-2023

BEFORE: BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY MURRAY, J.: **FILED DECEMBER 16, 2025**

The Commonwealth of Pennsylvania (the Commonwealth) appeals from the suppression court's order granting the omnibus pretrial motion (suppression motion) filed by the defendant, Maurice Cunningham (Cunningham), and suppressing evidence seized from his person following an investigative detention.[1] After careful review, we reverse the order of the suppression court and remand for further proceedings.

The suppression court summarized the testimony presented at the suppression hearing:

_____

[1] The Commonwealth has properly certified that the order will "terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d); **see** Notice of Appeal, 9/19/24.

Philadelphia Police Officer Brendan McCauley [(Officer McCauley)] was the sole witness to testify at the suppression hearing. Officer McCauley, who had 14 years of experience as an officer, conducted approximately 150 firearms arrests in the past three years.

In the past year[,] 5 to 10 of [Officer McCauley's] arrests involved individuals under [the age of] 21. Officer McCauley has been assigned to the 25th police district for the past 12 years. Officer McCauley has personal knowledge of the district as a very dangerous area.

He described the Kensington area of Philadelphia, where the incident took place, as [] very violent and in the top five areas for shootings every year. On April 4, 2023[,] as the sun was setting[,] Officer McCauley[,] with his partner[,] Office[r] Lane[,[2]] were patrolling in a marked vehicle in the area of the 200 block of [W]est Allegheny Avenue.

Officer McCauley observed [Cunningham] walking on the sidewalk. The officer testified that he saw a bulge on the right side of [] Cunningham. And that he looked to be aged 18 to 20.

Officer McCauley made a U-turn[, and] pulled to the side of the highway. [] Officer Lane exited the patrol vehicle. Officer Lane approached [] Cunningham on foot. Body-worn camera video admitted into evidence showed Officer Lane say to [] Cunningham, yo guy. That's not a gun in your pocket is it[?]

[] Cunningham removed an item from his left pocket, showed it to Officer Lane[,] and said that there was nothing in his pocket.[3] After this initial interaction, Officer Lane said to [] Cunningham that he was good to go[,] explaining that [Cunningham showed him a charging device,] [a]nd it was shaped like a gun. [] Cunningham turned and walked away.

---

[2] Officer Lane's first name is not provided in the notes of testimony.

[3] When Officer Lane approached, Cunningham bladed his body to the side to avoid showing his right side to the officers. N.T., 8/22/24, at 19.

Officer McCauley yelled out the window from within his [vehicle's] right side to communicate to his partner that he had seen the bulge on [] Cunningham's right side. Officer McCauley also yelled to [] Cunningham[,] you're young as shit.

Officer Lane continued to follow [] Cunningham on foot. Officer McCauley drove to the end of the block and stopped his vehicle on the sidewalk in front of [] Cunningham.

After the patrol car pulled up in front of him, [a]nd as Officer Lane was walking towards him from behind, [] Cunningham ran.

[] Cunningham was apprehended and a firearm was recovered. At the suppression hearing Officer McCauley testified that he believed [] Cunningham to be between the age of 18 and 20[,] because he had a young face and appearance.

Neither officer asked [] Cunningham how old he was nor did they ask for his ID….

N.T., 9/17/24, at 2-4 (footnote added).

On April 5, 2023, the Commonwealth charged Appellant, by criminal complaint, with carrying a firearm without a license, carrying a firearm on a public street in Philadelphia, and evading arrest or detention on foot.[4]

On September 12, 2023, Appellant filed his suppression motion seeking, *inter alia*, suppression of statements and evidence seized while in police custody. Suppression Motion, 9/12/23, ¶¶ 7-13. Appellant averred that the seizures were "the result of an illegal arrest—an arrest without legally efficacious warrant for probable cause[.]" *Id.* ¶ 6.

---

[4] 18 Pa.C.S.A. §§ 6106(a)(1), 6108, 5104.2.

- 3 -

The trial court conducted a suppression hearing on September 17, 2024. After the hearing, the suppression court concluded that the officers had engaged Cunningham in a mere encounter up until the time that "Officer Lane told [Cunningham] that he was good to go." N.T., 9/17/24, at 5. The suppression court further concluded that at the time the police vehicle blocked Cunningham, the encounter escalated into an investigative detention. *Id.* at 6. The suppression court opined that

> Officer McCauley's testimony that [] Cunningham had a young face and appearance does not identify specific and articulable facts to justify his conclusion that [] Cunningham was aged 18 to 20, and therefore, was unlawfully carrying a firearm.

*Id.* at 6. For this reason, the suppression court concluded that the investigative detention was not supported by reasonable suspicion. *Id.* Consequently, the suppression court granted Cunningham's suppression motion. Suppression Court Order, 9/17/24.

The Commonwealth timely appealed and filed a court-ordered concise statement of matters complained of on appeal. *See* Pa.R.A.P. 1925(b)(1). Although the suppression court filed an opinion, the court's opinion disagreed with its prior ruling, and recommended that we **reverse** the grant of Cunningham's suppression motion. Suppression Court Opinion, 3/4/25, at 7-8. The suppression court now concludes that under the totality of the circumstances, Cunningham's "furtive movements, the blading of his body, his youthful appearance, and the observation of a bulge prompted officers to reasonably suspect illegal firearm possession." *Id.*

On appeal, the Commonwealth identifies the following issue for our review:

> Did the lower court improperly grant [Cunningham's] motion to suppress—as that court now concedes it did in its Rule 1925(a) opinion—where police possessed reasonable suspicion to conduct an investigatory detention after an officer observed a bulge in [Cunningham's] pocket[;] [Cunningham] appeared too young to be lawfully armed[;] [Cunningham] behaved evasively prior to any interaction with the officers[;] and [Cunningham] engaged in unprovoked flight?

Commonwealth's Brief at 3.

The Commonwealth argues that the interaction between officers and Cunningham "escalated beyond a mere encounter once the officers chased the fleeing [Cunningham]." *Id.* at 10. The Commonwealth directs our attention to evidence that, after telling Cunningham he could leave, Officer Lane asked a follow-up question regarding a bulge on his right side. *Id.* Soon thereafter, Officer McCauley observed Cunningham crouching near a car, then fleeing. *Id.* at 11. According to the Commonwealth, the following factors established reasonable suspicion of criminal activity:

> 1) Officer McCauley's observation of a bulge consistent with a gun in [Cunningham's] right pocket; 2) [Cunningham's] youthful appearance, suggesting he was too young to legally possess a gun; 3) [Cunningham's] furtive movements – including reversing direction after seeing the officers, blading his right side away from Officer Lane, and crouching down near a car; and 4) his unprovoked flight.

*Id.* at 12. The Commonwealth asserts each factor is relevant in assessing reasonable suspicion, and collectively, gave rise to the existence of reasonable suspicion justifying an investigative detention. *Id.*

- 5 -

In a late-filed brief, Cunningham agrees with the suppression court that when Officer McCauley drove the marked police cruiser onto the sidewalk, the mere encounter escalated into an investigative detention. Appellee's Brief at 8. Cunningham argues that "[a] subjective youth estimate, unverified, coupled with an ambiguous 'bulge,' does not meet the standard" necessary to establish reasonable suspicion of criminal activity. *Id.* at 9. According to Cunningham, even if "blading" had occurred, the Commonwealth failed to establish reasonable suspicion. *Id.* Appellant further points out that his flight took place after his seizure, and cannot be considered in determining whether Officer McCauley possessed reasonable suspicion to conduct an investigative detention. *Id.* at 10.

> We review trial court suppression orders to determine
>
> whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record. In reviewing an appeal by the Commonwealth of a suppression order, we may consider only the evidence from the [defendant's] witnesses along with the Commonwealth's evidence which remains uncontroverted. Our scope of review of suppression court factual findings is limited to the suppression hearing record. We, however, are not bound by a suppression court's conclusions of law; rather, when reviewing questions of law, our standard of review is *de novo* and our scope of review is plenary.

*Commonwealth v. Barr*, 266 A.3d 25, 39 (Pa. 2021) (internal citations and quotation marks omitted). Further,

> [w]e must always keep in mind that the suppression court, as the finder of fact, has the exclusive ability to pass on the credibility of witnesses. *See Commonwealth v. Fudge*, 213 A.3d 321, 326

(Pa. Super. 2019). Therefore, we will not disturb a suppression court's credibility determinations absent a clear and manifest error. *Id.* at 326-27.

*Commonwealth v. Cunningham*, 287 A.3d 1, 7 (Pa. Super. 2022).

"At a suppression hearing, the Commonwealth has the burden of establishing by a preponderance of the evidence that the evidence was properly obtained." *Commonwealth v. Heidelberg*, 267 A.3d 492, 498 (Pa. Super. 2021) (*en banc*) (citation and quotation marks omitted); *see also* Pa.R.Crim.P. 581(H). "The preponderance of the evidence is the lowest burden of proof in the administration of justice, and it is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly in one's favor." *Commonwealth v. Easter*, 331 A.3d 675, 680 (Pa. Super. 2025) (citations and internal quotation marks omitted).

"The Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures." *Commonwealth v. Jones-Williams*, 279 A.3d 508, 515 (Pa. 2022). But not every interaction between citizens and the police constitutes a seizure. "There are three relevant cognizable categories of interactions between persons and police: a mere encounter, an investigative detention, and a custodial detention or arrest." *Commonwealth v. Chase*, 960 A.2d 108, 117 (Pa. 2008). Only the first two are implicated in this case.

A mere encounter "requires no particular suspicion of criminality because it carries no official compulsion to stop or to respond."

*Commonwealth v. Hicks*, 208 A.3d 916, 927 (Pa. 2019) (citation and internal quotation marks omitted). The Commonwealth does not contest that the police interaction with Cunningham began as a mere encounter, which escalated into an investigative detention.

A mere encounter escalates to an investigatory detention if "a reasonable person would have believed that he was not free to leave." *Commonwealth v. Livingstone*, 174 A.3d 609, 619 (Pa. 2017) (citation omitted).

> When that happens, for the stop to be proper the police must have a reasonable suspicion, based upon specific and articulable facts, that criminal activity is afoot. … [A] proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop and afford[s] due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.] [T]he totality of circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer. *Per se* rules are incompatible with a totality-of-the-circumstances inquiry. *See Hicks*, 208 A.3d at 939 (recognizing the "danger of *per se* rules, pursuant to which the totality of the circumstances inquiry—the whole picture—is subordinated to the identification of one, single fact").

*Commonwealth v. Lewis*, ___ A.3d ___, No. 37 EAP 2024, 2025 Pa. LEXIS 1498, at *19-20 (Pa. filed Sep. 25, 2025) (some internal quotation marks and citations omitted). Reasonable suspicion "is less than a preponderance of the evidence but more than a hunch." *Commonwealth v. Jackson*, 907 A.2d 540, 543 (Pa. Super. 2006) (citation omitted).

In *Hicks*, our Supreme Court explained that

[a]lthough the carrying of a concealed firearm is unlawful for a person statutorily prohibited from firearm ownership or for a person not licensed to do so, *see* 18 Pa.C.S. §§ 6105-06, there is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance. As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal. Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

*Hicks*, 208 A.3d at 936-37.

In the instant case, initially, the suppression court concluded police lacked reasonable suspicion to detain Cunningham, based on Officer McCauley's testimony regarding Cunningham's age:

Regarding the question of whether the officer had reasonable suspicion that [] Cunningham was not old enough to be licensed to carry[:]

[The court] find[s] that Officer McCauley's testimony that [] Cunningham had a young face and appearance does not identify [] specific and articulable facts to justify his conclusion that [] Cunningham was aged 18 to 20, and therefore, was unlawfully carrying a firearm.

N.T. (announcing the decision of the suppression court), 9/17/24, at 6. The suppression court further explained,

[E]ven if blading had happened[,] that doesn't change the standard under *Hicks*. And that, again, if those movements are indicative of the presence of a firearm, based on … just saying – that he has a young face. And then he looks like he's 18 to 20 as opposed to 21. That is not reasonable suspicion under my analysis.

- 9 -

*Id.* at 7-8.

However, in its Pa.R.A.P. 1925(a) opinion, the suppression court reconsidered its conclusion of law regarding reasonable suspicion:

> Upon further review of the record, as well as consideration of additional legal research not previously provided, [the c]ourt has reconsidered its prior decision to grant the motion….

Suppression Court Opinion, 3/4/25, at 2. Applying this Court's decision in *Commonwealth v. Keys*, 301 A.3d 929, 2446 EDA 2022 (Pa. Super. 2023) (unpublished memorandum),[5] the suppression court concluded that, considering contextual factors, Officer McCauley reasonably suspected Cunningham of criminal activity. Suppression Court Opinion, 3/4/25, at 8.

> The facts in the matter at hand are exceedingly similar to those in *Keys*. Here, officers observed [Cunningham] walking eastbound on the sidewalk in a high crime area of the City of Philadelphia. N.T., 8/22/24, at 17. Officer McCauley observed [Cunningham], who appeared young, turn his head back and look twice in the direction of the officers. [*Id.*] After Officer McCauley noticed a small bulge on [Cunningham's] right side, he made a U-Turn. [Cunningham] stopped, changed direction, and began walking westbound while he looked over his shoulder. [*Id.*] When Officer Lane approached, [Cunningham] bladed his body to the side to avoid showing his right side to the officers. [*Id.* at] 19.
>
> The [c]ourt finds that [Cunningham's] furtive movements, the blading of his body, his youthful appearance, and the observation of a bulge prompted officers to reasonably suspect [] illegal firearm possession. On the totality of these facts, police officers had reasonable suspicion to suspect that [Cunningham] was carrying a firearm illegally.

_____

[5] Unpublished memoranda filed after May 1, 2019, may be cited for persuasive value. *See* Pa.R.A.P. 126(b).

Suppression Court Opinion, 3/4/25, at 7-8 (suppression court's citation formatting modified).

Consequently, we focus our inquiry on whether, under the totality of the circumstances, the Commonwealth established reasonable suspicion to effectuate an investigatory detention on Cunningham. *Livingstone*, 174 A.3d at 619; *Lewis*, No. 37 EAP 2024, 2025 Pa. LEXIS 1498, at *19-20.

In *Keys*, upon which the suppression court now relies, Philadelphia police officers were on routine patrol in a marked police cruiser. *Keys*, 2446 EDA 2022, 301 A.3d 929 (unpublished memorandum at 1-2). At that time, the officers observed Robert Keys (Keys) walking towards them. *Id.* (unpublished memorandum at 2). One of the officers observed Keys glance towards the police cruiser "and subsequently adjust an object tucked in his front waistband." *Id.* The officers believed the object to be a firearm. *Id.* When the officers pulled alongside Keys, they inquired whether Keys was carrying a gun. *Id.* Keys denied carrying a gun, and continued walking, increasing his pace. *Id.* An officer exited the cruiser and again asked whether Keys possessed a firearm. *Id.* As the officer spoke, Keys "turned his body approximately 45 degrees to the left and stood with his arms roughly akimbo [blocking his waist]." *Id.* Moments later, the officer physically restrained Keys, as Keys stepped backwards. *Id.* Convinced that Keys was carrying a firearm, the officer grabbed at Keys's waistband and retrieved a firearm. *Id.*

Keys filed a pretrial suppression motion, which the suppression court denied. *Id.* (unpublished memorandum at 1-2). Following his conviction, Keys appealed, challenging the denial of his suppression motion. *Id.* (unpublished memorandum at 2-3). This Court ultimately concluded that the suppression court had not erred in denying Keys's suppression motion:

> Police may consider contextual factors to reasonably suspect that an individual's possession of a gun is illegal. *See Hicks*, 208 A.3d at 938-39 (recognizing that firearm possession may be suspicious in light of other factors, such as presence in a high crime area); *cf* … *Barr*, 266 A.3d [at] 41-42 … (drawing from *Hicks* to conclude that while the smell of marijuana alone does not provide probable cause to search a vehicle, it may be considered among other factors). Factors that are otherwise innocent, which can combine to support reasonable suspicion, **include angling one's body away from the police**, *Commonwealth v. Carter*, 105 A.3d 765 (Pa. Super. 2014) (*en banc*), and making furtive movements with extreme nervousness, *Commonwealth v. Buchert*, 68 A.3d 911, 916-17 (Pa. Super. 2013).

*Id.* (unpublished memorandum at 6). With this in mind, we review the suppression court's order granting Cunningham's suppression motion.

Our review of the record discloses that, although the suppression court granted suppression, the court nevertheless credited Officer McCauley's testimony. *See* N.T., 9/17/24, at 8 (announcing the findings and conclusions of the suppression court, and stating that the court "found Officer McCauley's testimony credible."). At the suppression hearing, Officer McCauley described his experiences in investigating gun possession on the streets in Philadelphia:

> A. [Officer McCauley:] Generally when they have a permit to carry a firearm, they usually give me their ID or permit to carry and I ask if I can run it. And then 99.9 percent of the time they actually allow me and I allow them to keep the firearm as well.

- 12 -

Q. [The Commonwealth:] Are they compliant?

A. They are. They don't run. They stay there. They let me run their ID. I usually give them a, hey, listen, your permit to carry is up in 2027 or 2028.

….

Q. Hundreds of gun arrests you made, Officer, what is the demeanor of people in your experience who are carrying firearms illegally?

A. A lot of times they run. They try to hide. They blade[6] their body. They throw the firearm. Just off the top of my head.

Q. Can you show the Judge what you mean by blading?
….

So, when someone is trying to blade their body they want to show you the one side that maybe they don't carry their firearm.

….

[I]f you are carrying on your right, you are going to show your left. If you are carrying on your left, you are going to show your right.

_____

[6] Our Supreme Court has explained that

A suspect's attempt to shield parts of his or her body or clothing from a police officer during a stop, an act sometimes referred to as blading, is an indication the suspect might be armed and may be considered in determining whether there is reasonable suspicion that the suspect is armed and dangerous.

*In re T.W*., 261 A.3d 409, 424 n.6 (Pa. 2021) (internal citations and quotation marks omitted).

N.T., 8/22/24, at 13-14 (footnote added). Officer McCauley testified that the 25th District of Philadelphia "led the City in top five shootings every year. Obviously, a lot of robberies, rapes, [a] violent area." *Id.* at 15.

Officer McCauley testified that on April 20, 2023, while on patrol with Officer Lane at around 7:30 p.m., he observed Appellant walking on the north side of the 200 block of West Allegheny Street in Philadelphia. *Id.* at 17. According to Officer McCauley,

> I thought I saw a little bulge on the side. That's weird. [Cunningham] looked young. Then I looked back and I noticed [Cunningham] turned his head and looked back in my direction of the police car twice. We turned the car around. At that time, he stopped and started walking[,] now westbound. And then he looks back over his shoulder again, almost like he was waiting to see what we were going to do next, which was a little suspicious to me. I don't know him.
>
> ….
>
> I tell my partner I think [Cunningham] has a gun on him. So [Officer Lane] hops out of the car. I think I just say, yo, he has a gun on him. I tell [Officer Lane, Cunningham] looks young[,] too. … [Officer Lane] asks [Cunningham] about a firearm. And I believe [Cunningham] just shows his left side real quick. In the meantime, as he is doing it, I'm saying, right side, right side. Because that is where I saw the bulge. When [Cunningham] first was walking eastbound[,] it was on the right hand side. I am telling [Officer Lane] from the car, … right side, right side. It was still there. … [Cunningham] blades his body a little bit and … he barely pulls it up, but just maybe shows the left side, but he won't show the right side, which is suspicious to me for someone who is claiming they don't have a firearm….

*Id.* at 17-19. Officer McCauley confirms that in his experience, blading to the side of a bulge is consistent with a person in unlawful possession of a firearm. *Id.* at 20.

Officer McCauley testified that after Officer Lane began walking back to the police vehicle, Cunningham

> starts walking off and keeps going westbound. I pull my car up probably 10 to 15 yards, kind of like next to him.[7] I'm past him just a little bit. And as I am noticing him, he is crouching down and … I thought he was getting rid of the firearm actually at first. I thought he was going to try and throw it underneath a car or something like that. He was reaching down and I go around and put my car in park and I see [Cunningham] crouch down and he starts running past my car. He runs … westbound then northbound through a lot….

*Id.* at 20-21 (footnoted added). According to Officer McCauley, Cunningham held his right arm in front of him as he ran past the police vehicle. *Id.* at 23, 25. Officer McCauley stated Cunningham's actions were consistent with a person concealing a firearm in that area. *Id.*

Officer McCauley articulated he was suspicious of criminal activity because Cunningham looked young; Cunningham crouched in a suspicious manner; and because Cunningham bladed his body, "not wanting to show his whole body to my partner …." *Id.* at 46. Officer McCauley reiterated,

> you have the blading of the body. [Cunningham] being, I believed he was younger than 21. Him crouching. Then he's running. It's from that point that I am going to stop him.

*Id.* at 52.

---

[7] Officer McCauley explained that he pulled his vehicle next to Cunningham, who was on the sidewalk, but did not block Cunningham. N.T., 8/22/24, at 23.

Considering the totality of the circumstances (including Cunningham's young appearance, his change of direction upon seeing a police vehicle, the blading of his body while talking to Officer Lane, his crouching and furtive movement when walking away from Officer Lane, and his subsequent flight with his arm pressed against his chest), we agree with the suppression court's conclusion, as stated in its second opinion: under the totality of the circumstances, Officer McCauley's investigative detention was supported by reasonable suspicion. Suppression Court Opinion, 3/4/25, at 8; *see also Lewis*, 2025 Pa. LEXIS 1498 *21 (stating the Supreme Court "has long recognized a suspect's presence in a high-crime area as a relevant factor in assessing reasonable suspicion."), *37-38 ("if the suppression court is satisfied the Commonwealth has introduced sufficient credible evidence implicating the area is high in crime, the court must then determine, in its sole discretion, what weight to assign to this factor"); *Commonwealth v. Barnes*, 296 A.3d 52, 58 (Pa. Super. 2023) (recognizing that unprovoked flight in a high-crime area is sufficient to create reasonable suspicion to justify an investigative detention under the 4th Amendment); *T.W.*, 261 A.3d at 424 n.5 (acknowledging that "a suspect's mere presence in a high crime area is not sufficient by itself to support reasonable suspicion. However, presence in a high crime area may be considered in examining the totality of the circumstances.") (citations and quotation marks omitted); *and id.* at 424 n.6 (recognizing that "blading" may be an indication the suspect is armed); *Hicks*,

208 A.3d at 938 ("A police officer is entitled to view individuals' conduct in light of the 'probabilities' that criminal activity may be afoot, and indisputably may draw 'certain common sense conclusions about human behavior.'"); *Keys*, 2446 EDA 2022 (unpublished memorandum at 6) ("Factors that are otherwise innocent, which can combine to support reasonable suspicion, include angling one's body away from the police, … and making furtive movements with extreme nervousness…." (citations omitted)).

Because we conclude the suppression court erred as a matter of law in granting Cunningham's suppression motion, we reverse the order of the suppression court, and remand for further proceedings.

Order reversed. Case remanded for further proceedings. Superior Court jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/16/2025

- 17 -